## LOGANSPORT RY. CO. v. CITY OF LOGANSPORT et al.

(Circuit Court, D. Indiana. March 8, 1902.)

No. 10,031.

1. EQUITY JURISDICTION—CONTRACTS BETWEEN STREET RAILROAD COMPANY AND CITY.

Before a street railroad company can complain, in a court of equity, of the violation by a city of its contract rights, it must show that it has a contract which is free from fraud and enforceable at law, and one which is fair and reasonable in all its parts, and within the power of the city lawfully to enter into. If it is unfair, unreasonable, or against good conscience, a court of equity is justified in refusing to enforce it, and in leaving the complainant to its remedy at law.

2. STREET RAILROADS—AUTHORITY TO USE STREETS—LAW OF INDIANA.

Under the law of Indiana, by which the fee of streets in cities is in the abutting lot owners, and exclusive authority, jurisdiction, and power over the streets of a city are vested by statute in the common council, such authority is held in trust for the benefit not alone of the city, but for that of all the people of the state, and extends only to the regulation of the use of streets for ordinary public purposes. The authority to lay tracks and operate a street railroad thereon can only be conferred by statute, in express words, or by language from which such power must be necessarily implied.

3. SAME—POWERS OF CITY COUNCIL.

By Act Ind. Sept. 7, 1861 (2 Burns' Rev. St. 1894, § 5450 et seq.), authority was conferred to organize street railroad companies, and to construct and operate street railroads, but it is provided that "nothing in this act contained shall be so construed as to take away from the common councils of incorporated cities the exclusive powers now exercised over the streets * * * within the corporate limits of such cities; and all street railroad companies * * * shall first obtain the consent of such common councils to the location, survey and construction of any street railroad through or across the public streets of any city, before the construction of the same shall be commenced." By Act March 3, 1891 (2 Burns' Rev. St. 1894, § 5473), horse railroads were authorized to use electricity for motive power; but the same reservation as to the power of city councils was made, and it was provided that companies desiring to change to electricity should first obtain the consent of the common councils, which might give such consent "upon such terms and conditions as they may see fit to impose." *Held,* that neither of

such acts conferred on the common council of a city, either expressly or by necessary implication, the power to grant to a street railroad company either an exclusive or a perpetual use of its streets for railway purposes.

4. SAME—ULTRA VIRES GRANT.

The common council of a city in Indiana, vested by statute with exclusive authority, jurisdiction, and power over the streets of the city, cannot alienate such power by a grant to a street railroad company in perpetuity of the right to build and operate railroads through such streets as it may from time to time elect to use and occupy.

5. SAME—CONTRACT CREATED BY ORDINANCE.

Such a grant, even if authorized and valid, amounts merely to an offer, which creates no contract as to a particular street until accepted and acted upon; and until such time the offer may be withdrawn by a repealing ordinance.

6. SAME—NECESSITY OF CONSENT OF CITY COUNCIL TO USE OF STREET—INDIANA STATUTE.

Under the statute of Indiana (2 Burns' Rev. St. 1894, § 5464) which requires all street railroad companies to first obtain the consent of the common council "to the location, survey, and construction of any street railroad through or across the public streets of any city," an ordinance giving general consent to a company to occupy and use any or all of the streets of the city for railway purposes, at its election, does not obviate the necessity of a specific consent to the location, survey, and construction of a road upon any particular street selected; and the company acquires no vested right to the use of such street until such consent has been given.

In Equity. On demurrer to bill.

Winter & Winter, Nelson & Meyers, and Charles A. Dryer, for complainant.

John G. Williams, McConnell, Jenkins & Jenkins, and Frank M. Kistler, for defendants

BAKER, District Judge. The question for decision is raised by a demurrer to the bill of complaint. The bill is brought by the Logansport Railway Company against the city of Logansport, and the mayor and members of its common council, to enjoin them from enforcing an ordinance adopted on October 30, 1901, on the ground that it is void because it impairs the contract rights of the complainant. The bill is in the nature of a bill for the specific enforcement of the complainant's contract rights against alleged infringement by the enforcement of the later ordinance. Before the complainant can, in a court of equity, complain of the violation by the city of its contract rights, it must show that it has a contract, and that such contract is free from fraud and enforceable at law, and one that is fair and reasonable in all its parts, and within the power of the city lawfully to enter into. If the contract is unfair, unreasonable, or against good conscience, a court of equity would be justified in refusing to enforce it, and would leave the party to its remedy at law. The court, too, must enforce the contract, if it enforces it at all, just as it is written; and it has no power, by changing or varying material terms, to make, in effect, a new contract for the parties.

By an act of the legislature of this state in force on September 7, 1861 (2 Burns' Rev. St. 1894, §§ 5450–5454, 5463, 5464), authority

114 F.—44

was conferred on any number of persons, not less than five, to incorporate as a street railway company in perpetuity; prescribing its powers, and providing generally for the construction of the street railway. By section 5464 it was enacted that:

"Nothing in this act contained shall be so construed as to take away from the common councils of incorporated cities the exclusive powers now exercised over the streets, highways, alleys and bridges within the corporate limits of such cities; and all street railroad companies which may be organized under the provisions of this act shall first obtain the consent of such common councils to the location, survey and construction of any street railroad through or across the public streets of any city, before the construction of the same shall be commenced."

By the first section of an ordinance adopted on December 6, 1882, the consent, permission, and authority of the city of Logansport were given, granted, and duly vested in the Logansport Railway Company, to lay and construct a single or double track for a street railway, with all necessary and convenient tracks, turn-outs, etc., in and along the course of the streets and bridges of the city of Logansport hereinafter mentioned, and the same to occupy, maintain, and use, and to operate thereon street railway cars, etc., in perpetuity, and in the manner and upon the conditions set forth in the ordinance. By the second section of the ordinance it was provided that said railway company, its successors and assigns, were exclusively authorized to construct, own, and keep, maintain and operate, street railways therein provided for, as follows: Commencing at the center of Fourth street, on the north line of Canal street, thence southerly through Fourth street to Market street, thence easterly through Market street to Second street, thence northerly through Second street to Broadway, thence easterly through Broadway to the easterly limits of the city; also through such other streets and over such bridges in said city as the said company, its successors and assigns, might from time to time elect to use and occupy: provided, that the common council reserves the right to ordain and direct said company to build and operate a line of railway through other streets, and if the company, its successors or assigns, fail or refuse to construct and operate such line on such streets within one year, then and in that event the common council may grant the privilege to any other company. The power to be employed in moving the cars was restricted to animal power. By an act of the legislature in force on March 3, 1891 (2 Burns' Rev. St. 1894, § 5473), it was enacted that:

"Any street or horse railroad heretofore or hereafter organized in this state may, with the consent of the common council of the city in which the railroad or any part thereof is located and operated, and with the consent of the board of commissioners of the county where such railroad or any part thereof is operated beyond the limits of such city, use electricity for motive power: provided, that nothing in this act contained shall be so construed as to take away from the common councils of incorporated cities the exclusive powers now exercised over the streets, highways, alleys and bridges within the corporate limits of such cities, and all such street railroad companies shall first obtain the consent of such common councils for the operation by electricity of their cars along, through or across the public streets or alleys of any city before the operation by electricity of their cars shall be commenced: provided, that in giving such consent such common council or board of county commissioners may do so upon such terms and conditions as they may see fit to impose."

After the enactment of this statute, on July 3, 1891, the common council of the city of Logansport adopted an ordinance by the first section of which it was provided:

"That consent, permission and authority be and are hereby given, granted and hereby vested in said Logansport Railway Company, its successors and assigns, to operate by electricity its cars, carriages and vehicles of any kind and character along, through, on, over and across the streets, and alleys, bridges and highways in the said city of Logansport now existing or that may be hereafter established or constructed as it may from time to time elect, in perpetuity."

There was the same reservation to the city as is contained in the ordinance of 1882 in respect to the right to require the company to construct a railway and operate cars on other streets than those occupied by it.

The statute of this state confers exclusive authority, jurisdiction, and power over all streets, highways, alleys, and bridges within the corporate limits of cities in this state on the common council. In Eichels v. Street Ry. Co., 78 Ind. 261, 41 Am. Rep. 561, it was held that the authority to lay the tracks and operate a railway on the streets of a city can only be conferred by statute in express words, or by language from which such power must be necessarily implied. Such a power, it was said, is an extraordinary one, and one which cannot be implied from a charter of a municipal corporation which confers only the usual powers ordinarily bestowed upon such corporations. Hence the sole power possessed by the city of Logansport to grant an exclusive and perpetual right to the complainant to occupy and use such streets of the city for street railway purposes as it might from time to time elect depends upon the acts of 1861 and 1891 above mentioned. We are not concerned with the question whether or not the legislature possesses the constitutional power to grant to the cities of this state the authority to confer upon street railway companies the exclusive and perpetual use of such streets of the city as they may from time to time elect to use and occupy. The question in hand is, has the legislature conferred upon the city of Logansport any such power? The fee of the streets in cities in this state resides in the abutting lot owners, and the city possesses only an easement of way in the streets. It does not hold title to the easement as a private property right, which it may alienate at pleasure, as it might alienate property belonging to the city by a title unimpressed with a trust. The city holds the easement in the streets in trust not simply for the city alone, but for the benefit and use of all the people of the state. In interpreting the statutes, the court ought never to lose sight of the fact that in dealing with the use of the streets the common council of a city is acting as a trustee for the benefit and advantage of the public.

It is manifest from a reading of the above-mentioned statutory provisions that the legislature has not conferred, in explicit and express words, on the city of Logansport, the power to grant to a street railway company either an exclusive or a perpetual use of its streets for railway purposes. The act of 1861 simply provides that the street railway company shall first obtain the consent of such common council to the location, survey, and construction of its railroad, before the con-

struction of the same shall be commenced. No words of perpetuity are expressly employed. The same is true of the act of 1891. There being no express words of perpetuity in the legislative grant, is such power necessarily to be implied from the language employed? In Detroit Citizens' St. R. Co. v. Detroit Ry., 171 U. S. 48, 18 Sup. Ct. 732, 43 L. Ed. 67, the question for decision was whether the legislature of Michigan had conferred power on the city of Detroit to grant to a street railway company the exclusive use of its streets. The statute provided that:

"All companies or corporations formed for such purposes [the railway purposes mentioned in the act] shall have exclusive right to use and operate any railways constructed, owned or held by them: provided that no company or corporation shall be authorized to construct a railway under this act through the streets of any town or city without the consent of the municipal authorities of such town or city, and under such regulations and upon such terms and conditions as said authorities may from time to time prescribe."

The court says:

"It is clear that the statute did not explicitly and directly confer the power on the municipality to grant an exclusive privilege to occupy its streets for railway purposes."

And so it must be held here that similar and no broader language employed in the acts of 1861 and 1891 above mentioned does not explicitly and directly confer the power on the common council of the city of Logansport to grant either an exclusive or a perpetual privilege to occupy its streets for railway purposes. The court further says:

"There were many reasons which urged to this; reasons which flow from the nature of the municipal trust,—even from the nature of the legislative trust,—and those which, without the clearest intention explicitly declared, insistently forbid that the future should be committed and bound by the conditions of the present time, and functions delegated for public purposes be paralyzed in their exercise by the existence of exclusive privileges."

And how much stronger are the reasons which insistently forbid that the future should be committed and bound in perpetuity by the conditions of the present time, and that functions delegated for public purposes should be forever paralyzed in their exercise? That such powers must be given in language explicit and express, or necessarily to be implied from other powers, is now firmly established.

The power to grant the use of its streets in perpetuity not having been granted to the city of Logansport in explicit and express words, is it granted by a necessary implication? The supreme court, in the above-cited case, further says:

"Mr. Justice Jackson, in Grand Rapids E. L. & P. Co. v. Grand Rapids E. E. L. & F. G. Co. (C. C.) 33 Fed. 659, says * * * 'that municipal corporations possess and can exercise only such powers as are granted in *express words* or those *necessarily* or *fairly* implied, *in or incident to the powers expressly conferred, or those essential to the declared objects and purposes of the corporation,—not simply convenient, but indispensable.*' The italics are his. This would make 'necessarily implied' mean inevitably implied. The court of appeals of the Sixth circuit, by Circuit Judge Lurton, adopts Lord Hardwicke's explanation, quoted by Lord Eldon in Wilkinson v. Adam, 1 Ves. & B. 422, 466, that 'a necessary implication means not natural necessity, but so strong a probability of intention that an intention

contrary to that which is imputed to the testator cannot be supposed.' If this be more than expressing by circumlocution an inevitable necessity, we need not stop to remark, or, if it mean less, to sanction it, because we think that the statute of Michigan, tested by it, does not confer on the common council of Detroit the power it attempted to exercise in the ordinance of 1862. To refer the right to occupy the streets of any town or city to the consent of its local government was natural enough,—would have been natural under any constitution not prohibiting it,—and the power to prescribe the terms and regulations of the occupation derive very little, if any breadth, from the expression of it."

But assuming that the power "to give consent upon such terms and conditions as the common council may see fit," found in the act of 1891, does acquire breadth from such expression, surely there is sufficient range for its exercise without extending it so as to embrace the power to grant the use of the streets in perpetuity. The supreme court, further on, says:

"Easements in the public streets for a limited time are different, and have different consequences, from those given in perpetuity. Those reserved from monopoly are different, and have different consequences, from those fixed in monopoly. Consequently those given in perpetuity and in monopoly must have for their authority explicit permission, or, if inferred from other powers, it is not enough that the authority is convenient to them, but it must be indispensable to them."

Can it be successfully contended that the perpetual use of the streets of a city is indispensable to their use for railway purposes?

But there are other reasons why the bill cannot be maintained. The ordinances of 1882 and 1891 grant the exclusive right to use in perpetuity certain streets, designated by name, and also the right to use and occupy such other streets and bridges in the city as the street railway company, its successors and assigns, may from time to time elect to use and occupy. The repealing ordinance expressly excepts from its operation all the streets and parts of streets occupied and in use by the complainant at the time of its adoption. Its effect is simply to repeal so much of the ordinance of 1882 as purported to grant to the complainant the right to use and occupy such other streets of the city as it might from time to time elect to use and occupy, and also to repeal so much of the ordinance of 1891 as purported to grant to the complainant the right to use and occupy, at its election, all the streets of the city then existing or thereafter to be established, in perpetuity. The right granted, except as to the designated streets, was a mere offer, which could only become a contractual obligation by the election of the complainant to use and occupy the streets for railway purposes. Such election must be made in good faith, and evidenced by some open and notorious act brought to the notice of the common council. Until the offer was accepted by such an election, it could be withdrawn.

But the grant is open to a more serious objection. It was ultra vires of the common council to surrender its control of the streets of the city in perpetuity to the complainant. The municipal authorities had no power to grant forever to the complainant the right, at its own uncontrolled election, to use and occupy such or all of the streets of the city as it might from time to time elect. The right to determine for itself from time to time what streets could be used and occupied for street railway purposes consistently with the public safety and welfare

is a power incapable of absolute alienation by the common council. By these ordinances the common council has undertaken to surrender this power, and to remit it to the uncontrolled election of the complainant. The only power reserved is the power, if the common council wishes the railway to be extended along a particular street, to notify the complainant of such desire; and, if it fails within one year to construct and operate its road on such street, then the use of such street may be granted to another railway company. But no right or power is reserved to prevent the railway company, at its election, from using with a double or single track any and all the streets of the city, however injurious it may be to the public convenience, safety, or welfare. The public convenience, safety, and welfare, in this regard, are surrendered to the complainant. By these ordinances, if valid, to the complainant's election is relegated the question whether or not a street can, with due regard to the comfort and safety of the people, be occupied by a single or a double track railway. Such a surrender of corporate power in perpetuity to a street railway company cannot and ought not to be upheld. It cannot be supported as a reasonable exercise of the power of a trustee over a trust estate committed to its charge, to be administered in the interest of the public, and not for the private advantage and gain of railway or other corporations.

But if the granting ordinances are not invalid and unenforceable so far as the repealing ordinance affects them, still the bill cannot be maintained for another reason. It was ruled in the opinions of Judge Woods and myself, both concurring in this particular, in Citizens' St. R. Co. v. City R. Co. (C. C.) 64 Fed. 647, that, under ordinances similar to those granted to the complainant, the Citizens' Street Railroad Company acquired no vested right to commence the construction of a particular line of street railway on an unoccupied street without first obtaining the consent of the common council to "the location, survey, and construction" of such proposed line. No such consent is alleged to have been obtained before the complainant began to construct its railway on George street, High street, Erie avenue, and Seventeenth street. It is simply averred that the complainant gave notice of its intention to construct such street railway, and then, without asking or waiting for the consent of the common council, it began to tear up these streets and to lay down its tracks. By the ordinances of 1864 and 1865 the city of Indianapolis granted to the Citizens' Street Railroad Company the right to enter upon, use, and occupy for the term of 30 years all the streets of the city then existing and thereafter to be established, for street railway uses and purposes. Under this grant the company had constructed and had in operation about 40 miles of street railway. In 1889 the common council and board of aldermen of the city of Indianapolis adopted an ordinance prohibiting the railway company from entering upon or constructing its railway on any unoccupied street until it had first obtained the consent of the city street commissioner. In 1893 the city granted to the City Railway Company the right to enter upon and construct a street railway system on and along 29 specified routes, embracing a great proportion of the most important streets of the city, and including many of the streets on which the Citizens' Street Railroad Company had construct-

ed its railroad, and had it in operation. It was claimed by the Citizens' Street Railroad Company that the two later ordinances infringed the contract rights secured to it by the earlier ordinances of 1864 and 1865. In discussing this question, Judge Woods said:

"I am of the opinion that the complainant is not entitled to equitable relief in respect to its alleged rights in the streets so designated for the use of the defendant. Prior to that designation the complainant had no lines upon those streets, except a fragment on Pennsylvania street, which had been practically, if not legally, abandoned. By its own charter, as I construe it,—indeed, according to the plain letter,—it had no right to commence construction on a particular line without first having obtained the consent of the common council to the 'location, survey, and construction' proposed. The necessity for this consent was not affected, as I think, by anything contained in the ordinance of January 18, 1864, or in the supplemental ordinance of September 18, 1865. Besides, the entry of the complainant upon those streets was in violation of the ordinances of 1889 and 1893; and, if rights were thereby acquired, the complainant, in view of all the circumstances, should rely upon the courts of law for their defense, rather than look to equity for their establishment. The question whether the last-named ordinances are valid or not need not be considered, because, by its own charter, the complainant had no right to enter upon a street without the consent of the city; and the city was free, with or without reason, to give or withhold its consent."

This was said by the learned judge notwithstanding the city of Indianapolis had given a general consent, permission, and authority to the Citizens' Street Railroad Company to enter upon, use, and occupy for railroad purposes, all of the streets of the city. In the same case Judge Baker said:

"Prior to the designation of the additional north and south streets for the use of the defendant, the complainant had no lines upon those streets, except a fragment upon South Pennsylvania street, which had been practically, if not legally, abandoned. I do not think the complainant, under the ordinance of 1864 or 1865, had any vested right to commence the construction of a particular line without first obtaining the consent of the common council to the location, survey, and construction of such proposed line. Therefore the complainant, having obtained no consent from the city to occupy the streets in question, has no right to complain of their occupation by the defendant company."

The consent conferred upon the Logansport Company by the ordinances of 1882 and 1891, so far as the ordinance of October 30, 1901, affects them, is not so clear and explicit in giving consent and granting authority to enter upon the streets of the city of Logansport as were the ordinances of 1864 and 1865 adopted by the common council of the city of Indianapolis. Judges Woods and Baker, in the above-cited case, held that the general consent conferred by the original ordinances to occupy and use all of the streets of the city for railway purposes did not satisfy the statute, nor take away from the common council the right, before the railway company should construct a street railway upon an unoccupied street, to require it to obtain the consent of the common council to its location, survey, and construction.

For these reasons I am of opinion that the demurrer to the bill should be sustained, and it is so ordered.