STATE OF IOWA, ex rel., County Attorney and ROBERT FULLER-TON, et al., Appellants, v. DES MOINES CITY RAILWAY COMPANY, Appellee, and CITY OF DES MOINES, Appellant.

**Courts:** DECISIONS: WHEN AN ADJUDICATION. Unless a proposition presented in argument was made or should have been made an issue by proper pleadings, its decision by the court is not an adjudication of the question involved.

**Municipal corporations:** FRANCHISES: EXTENT OF POWER. A municipal corporation can exercise only such power in granting easements in its public streets. as is expressly conferred upon it, or necessarily or fairly implied in, or incident to the power expressly granted, or essential to its declared objects and purposes; it is not enough that the authority is convenient to the city, it must be indispensable.

**Same:** CONSTRUCTION OF GRANTS. All municipal grants and franchises will be strictly construed against the grantees enjoying exclusive privileges conferred upon them by the corporation.

**Same:** CONTRACTS: FRANSHISES: DISTINCTION. A city does not ordinarily act in a private or proprietary capacity in granting a franchise to a public service corporation, but as the agent of the state, and its franchise is a grant from the state; but in contracting for water for fire and other purposes and for lights for its streets, it acts in a private capacity.

**Same:** STREET RAILWAYS: INVALID GRANT: EFFECT. Prior to the adoption of the Code of 1873, cities had no power to grant franchises to public ·service corporations, and an exercise of such a power amounted to no more than a license, terminable at pleasure; and in the case of a street railway its tracks were removable as a nuisance by any person specially injured thereby, or by the state.

**Same:** GRANT OF FRANCHISE: LIMITATION OF POWER. The legislature may, either in the Act creating a municipal corporation or by special grant, confer upon any person or corporation an exclusive or permanent and perpetual right to occupy the streets and other public places of a city for street railway purposes, subject to no other limitation than that contained in the Act itself or in the constitution; and the constitutional limitations are inapplicable to exclusive franchises for a reasonable length of time.

**Same:** GRANT OF FRANCHISE: SCOPE OF MUNICIPAL POWER. The legislature may give to a municipality power to grant franchises and may prescribe, limit and fix the terms of the grant; but if the Act granting the power is unlimited as to time and conditions then the municipality has such powers, as are expressed or necessarily implied, and no more. If the language of the grant is general then regard must be had of the reasonableness or unreasonableness of the grant, and upon that question public policy may be a controlling factor. Under the Code of 1873, empowering a city council to authorize or forbid the location and laying of street railway tracks, the council had no power to grant a perpetual franchise, and as it could not do indirectly what it had no power to do directly, evidence as to practical construction or estoppel would not aid the claim of a perpetual franchise.

**Same:** STREET RAILWAYS: DURATION OF FRANCHISE: CONSTRUCTION. The grant of a franchise to a street railway company, its successors or assigns, does not necessarily terminate with the life of the original grantee, but may extend for a longer term. The franchise in the instant case was not perpetual nor was it for the life of the original grantee; but it was either for a stated period, during which it was exclusive, or was ambiguous and subject to parol explanation, in which case it could not be made perpetual by construction, the acts of the parties or estoppel.

**Same:** TERMINATION OF FRANCHISE: OUSTER: LACHES. Where a street railway company has continued to operate after the expiration of its charter, the doctrine of laches is not applicable in an action to oust the company from the streets of the city, except as it may be considered in determining the final order to be made.

**Same:** FRANCHISE: PRACTICAL CONSTRUCTION. The evidence in this case is held to show that neither of the parties by their acts and conduct have regarded the original ordinance under which the defendant operates as perpetual.

**Same:** OUSTER: REASONABLE TIME FOR REMOVAL. Where a street railway company, after expiration of its charter, continued to occupy and improve the streets, and during that time its right so to do was not contested by the city, it should be given a reasonable time, after a decree adjudging that it had no right to occupy the streets, to either obtain an extension of its franchise, dispose of or remove its property.

*Appeal from Dallas District Court.*—HON. J. H. APPLEGATE, Judge.

SATURDAY, MARCH 22, 1913.

THIS is a quo warranto proceeding instituted by certain private citizens on behalf of the State of Iowa, and thereafter joined in by the County Attorney against the Des Moines City Railway Company to test the right of the defendant company to maintain and operate its street railway upon the streets of the city of Des Moines. The city was made a party to the original proceedings on the theory that it was its duty to oust the defendant from its streets, and that it had failed and neglected to do so. Both the street railway company and the city answered; the former asserting its right to maintain and operate its railway under various ordinances passed by the city, and because of the conduct of the city in recognizing its right to use and occupy the streets, and for various other reasons which will appear in the body of the opinion. The city answered, denying that it had in any manner failed in its duty; and it also averred and admitted that the relief prayed in the petition should be granted, and it joined in asking the relief prayed by plaintiff. That relief was that the Street Railway Company be declared to have no franchise to construct, operate, or maintain a street railway upon the streets of the city of Des Moines; that it be ousted therefrom

and deprived of the use of the said streets for its railways, and declared to have no franchise or other rights thereon or therein. The case was tried to a jury, and, at the conclusion of the testimony both parties moved for a directed verdict. The motion of the street railway company was sustained, and the plaintiff and the city of Des Moines appeal.—*Reversed.*

*Robert O. Brennan, H. W. Byers, Howard J. Clark, J. M. Parsons, E. C. Carlson* and *E. W. Dingwell,* for appellants.

*Guernsey, Parker & Miller* and *Reed & Reed* and *White & Clark,* for appellee.

DEEMER, J.—The case was before us at a former term upon some interlocutory orders made by the trial court, and it was there held, in effect, that quo warranto would lie, and that the action was commenced by proper parties. See *State v. Railway Co.,* 135 Iowa, 694. The opinion in that case recites the nature of the proceedings at length, and we need only notice in this connection that the action was commenced September 5, 1905. It was allowed to drag along for some reason, and was not finally tried in the district court until the latter part of the year 1910; the defendant City Railway Company assuming the burden of proof at that trial. Cases involving to some extent, at least, the franchises under which defendant claims reached this court many years ago; one of them, entitled, *Des Moines Street R. R. Co. v. Des Moines Broad-Gauge Street Ry. Co.,* having been decided as early as the year 1887, the opinion being found in 73 Iowa, 513. Another under the same title was decided later, the opinion being found in 74 Iowa, 585; and still another, under a different title, came here later, and an opinion was filed, which is reported in *Teachout v. Des Moines Broad-Gauge St. Ry. Co.,* 75 Iowa, 722; and still another at a much later date, the opinion being found in *Des Moines City Ry. Co. v. City of Des Moines,* 90 Iowa, 770. We shall have more to say of these

opinions as we proceed.   Reference is made to them now because they give some insight into the history of this litigation.

As defendant admitted that it was operating a street railway upon the streets, highways, and bridges of Des Moines, and assumed the burden of showing its right to do so, we may materially shorten the issues by stating its claim of right in the premises.   It avers that it is operating under a franchise granted by the city of Des Moines in virtue of an ordinance, known as No. 63, regularly adopted by the city of Des Moines on the 10th day of December, 1866; that, while the ordinance did not grant any rights to this defendant, it became the owner and possessor of said rights by assignment from the Des Moines Street Railway Company, the grantee therein, and is entitled to all the rights and privileges of the grantee company in virtue of its assignment.   It claims that, by the terms of this ordinance, it was granted an exclusive franchise for the term of thirty years after the passage thereof, and a perpetual franchise thereafter in competition with any other companies to whom franchises might perchance be granted. It also claims that, if these rights were not expressly conferred, the ordinance is ambiguous, and that the parties thereafter put such a practical construction thereon as to indicate that all parties to the ordinance understood its duration as to time, was as claimed by the company, and that, in virtue thereof, it should be given this construction.   Again it is claimed for the street railway company that, acting upon the assumption that the ordinance was unlimited as to time, it, by express direction and orders of the city, made extensive and valuable improvements upon the streets, and complied with all the orders of the city authorities in the belief and with the understanding of all parties that the ordinance was unlimited in its duration, and that, by reason of these facts, the city is estopped from asserting to the contrary, or that plaintiffs are at least estopped from claiming that a judgment of ouster should be presently entered against it.   It further claimed that

all matters now in controversy have been adjudicated in the prior decisions of this court to which references have been made. These claims were each and all denied by plaintiff, save, it is admitted, that the city council passed the ordinance on which the company relies in the year 1866; but it says that at that time the city had no authority to grant any franchise to the company authorizing it to use or occupy the streets of the city for street railway purposes. Responding to this, counsel for the street railway assert that, assuming this to be true, the original ordinance was in effect re-enacted in the year 1874, after the Legislature had given cities and towns of the state authority to grant franchises to street railway companies, and that, upon its re-enactment, it became as efficient as if power had been granted in the first instance to the city to pass it. This latter contention must be considered foreclosed by the opinion filed in one of the prior cases to which we have referred. See 73 Iowa, 513. In that opinion it is said:

The defendant company's next position is that the provision in question is void for want of power in the city to make such provision. The fact is that there does not seem to have been, as early as 1866, any legislative grant to the city of power to confer upon an individual or corporation an exclusive right. The plaintiff contends that no legislative grant was necessary, and adduces some very able arguments in support of its position. We do not find it necessary to determine this question. It was afterwards provided, in section 464 of the Code of 1873, that the city council shall have 'power to authorize or forbid the location and laying down of tracks for railways and street railways.' The plaintiff contends that the power to forbid is sufficient to enable the city council to make a granted right practically exclusive, for such time as it may see fit, by withholding the right from others. This, of course, cannot be denied. The doubt, if any, is as to whether the council, having the power to make a granted right practically exclusive by withholding it from others can bind itself by contract to withhold it for a limited time from others, if it shall deem it necessary to make

such contract in order to secure a service to the public which it might not otherwise be able to do.  . . .

Having reached the conclusion that, under the section of the Code above cited, the power had been conferred to make the contract in question, we have to consider whether it appears that the city council, after the Code took effect, ratified the contract which it had previously (and, as we will assume, without power) undertaken to make.  There is no question but that the council undertook to adopt an ordinance purporting to revise and re-adopt certain ordinances including the one under which the plaintiff's assignor commenced the construction of the road.  It is claimed, however, that this ordinance is void, because it embraced as many subjects as there were ordinances referred to.  For the purposes of the opinion, it may be conceded that what purports to be an ordinance did not take effect as such.  But it appears to us that it has the force, at least, of a resolution, so far as the provision in question is concerned.  The plaintiff's assignor acted upon it, and expended money, not only in laying additional tracks, but in paying for street pavement.  We feel justified in saying that every one understood that the ordinance of 1866 was ratified and binding upon the city and the plaintiff's assignor, and that what was done afterwards was done with that understanding.

It is true that it is provided in the so-called ordinance, relied upon as an act of ratification, that 'all ordinances granting privileges, or which expired after a term of years, shall not be enlarged or abridged by their incorporation into these revised ordinances.'  The defendant relies in part upon this provision.  It insists that, if the plaintiff is sustained, it would follow that an ordinance granting a privilege would be enlarged.  In one sense this might be true, but not, we think, in the sense of the provision.  In our opinion, the meaning of the provision is that the ordinances thus revised should not be enlarged beyond the original intention.

This forecloses any further inquiry as to the power of the city to grant a street railway franchise, and as to whether it did in fact grant one to plaintiff's assignor.  But it is also contended for the street railway company that these decisions, to which we have referred, or some of them, or rather the de-

crees therein rendered, constitute an adjudication binding upon all the parties to the effect that the company has a franchise, either in perpetuity or at least for the life of its corporate existence, to maintain and operate its railway upon the streets of the city of Des Moines. An examination of these decisions and decrees shows, however, that there is nothing therein which expressly so declares. All these cases arose before there was or could be any issue as to whether or not the company had a franchise for more than thirty years. In other words, at the time these cases arose and were decided, the street railway was being operated under a franchise which admittedly had not expired under any construction of the ordinance; and the company's rights in the franchise, after the expiration of the thirty-year period, were not in issue nor were they expressly decided. It is true that the city of Des Moines in one of the cases, in order to defeat the exclusive feature of the ordinance for the period of thirty years, advanced the argument which it attempted to sustain by the citation of authorities to the effect that the grant was in perpetuity with exclusive rights for thirty years, and, that being perpetual, the entire ordinance was void. This court made no pronouncement upon this proposition, and doubtless disregarded it, for the plain reason that, even if there were a grant in perpetuity after the exclusive period of thirty years, such grant would not defeat the entire ordinance. It would nevertheless be good for the period of thirty years unless the exclusive feature of the grant was bad. The court held, however, that the grant of exclusive rights for the limited period mentioned was good, and there was no necessity for passing upon the other proposition. These views are sustained by authorities. See *Cedar Rapids Co. v. Cedar Rapids,* 118 Iowa, 234; *Sommers v. Cincinnali,* 6 Ohio Dec. 887; *Neosho Co. v. Neosho,* 136 Mo. 498, (38 S. W. 89); *Illinois Trust Co. v. Arkansas City,* 76 Fed. 271, (22 C. C. A. 171, 34 L. R. A. 518).

I.   The decision of a point made in argument is not an

adjudication of the question involved, unless the proposition is made one of the issues, or should have been made of the issues in the case by proper pleadings. This rule is fundamental, and no authorities need be cited to sustain so plain a proposition. We start, then with the following propositions: (a) The defendant street railway company, as successor in interest to the original grantee, holds or held a franchise from the city of Des Moines under an ordinance which was re-enacted by the city council of that city in the year 1874, at a time when the council had a right to grant a franchise to operate a street railway upon the streets of that city. (b) It has already been decided that it had a valid exclusive franchise to so operate its road for the time mentioned in said ordinance, to wit, for thirty years from and after the time the first mile of track was laid by the original grantee of the franchise, and the cars were running thereon; and the evidence shows that this was on the 1st day of January, 1868. So that on January 1, 1898, the exclusive period expired. (c) It has never, heretofore, been held in any case that it, or any of its assignors, had any franchise rights whatever after the expiration of this thirty-year period, and defendant's plea of former adjudication is without avail. This brings us, then, to a consideration of the one vital question in the case, For what length of time, if any, after the expiration of the thirty years, does this franchise extend? To properly solve this question, we must first turn to the ordinance itself. The material parts thereof read as follows:

1. COURTS: decisions: when an adjudication.

Section 1. Be it ordained by the city council of the city of Des Moines: That consent, permission and authority is hereby given and granted to and duly invested in the Des Moines Street Railway Company, and their successors and assigns, to lay a single or double track for passenger railway lines, with all necessary and convenient tracks for turn outs, sidetracks, and switches, upon and along all the streets, and such alleys only fronting on which said company have depots,

stable or car houses, and over the bridges and on such streets in the city of Des Moines, with their present and future extensions and connections, and authority is hereby given said company, their successors and assigns to keep, maintain, use and operate thereon railway cars in the manner, *and for the time*, and upon the conditions hereinafter mentioned and prescribed.

Section 2 has reference to the power, and provides that no railway cars should be used on any of the tracks. Section 3 provides that the road should be used for the transportation of passengers and baggage only, excepting material used for construction purposes. Section 4 has reference to the laying of the tracks. Section 5 provides that the city shall not be liable for damages done to gas and water pipes, sewers, etc. Section 6 makes provision as to where the tracks, switches, and turnouts should be laid. Section 7 has reference to the rates of fare to be charged. Section 8 gives precedence to the street cars over other vehicles, and provides a penalty for the obstruction of the street car tracks. Section 9 reads as follows:

This charter is granted, and the rights and privileges herein conferred are subject to the following conditions and qualifications only, to wit: The said company shall have at least one mile of said railway fully completed and equipped, and cars running thereon, by the first day of January, A. D. 1869. That they shall have one additional mile so completed and equipped, and cars running thereon, by the first day of January A. D. 1872, unless the city council of said city shall grant to said company a further extension of time, and on the failure of said company to construct the number of miles of said railway within the time herein specified, all rights and privileges herein granted shall be forfeited, and revert to the city of Des Moines: Provided, that if said company is delayed in the construction of said railway by order or injunction of any court or judge thereof, the time of such delay shall be given to said company over and above the time given by this section for the completion of such given number of miles of said railway: Provided, that in case any such in-

junction or order of court or any judge is procured upon the application of any party other than the city of Des Moines, said company shall immediately notify the mayor and city solicitor of such injunction or order; and thereupon the mayor shall appoint the city solicitor to resist such injunction or order, and to obtain a dissolution of the same, or to assist the attorney of said company. Said company shall pay all expenses that may accrue by reason of such suit or suits and unless such notices are given the time of continuance of such order or injunction shall not be given to said company. The foregoing extension of time for the construction of said railway is granted upon the express condition that said company, in the construction of the railway upon all bridges upon which the same may run, shall so construct the same that the top surface of the rails of said railway shall be even with and upon a level with the surface of the floor of the bridges as near as practicable.

Section 10 reads in this wise: "The right herein granted to said company to operate said railway, shall be exclusive for the term of thirty (30) years from the time the first mile of said track is laid and cars running thereon, and the said city of Des Moines shall not, until after the expiration of said term, grant to or confer upon any person or corporation any privileges which will impair or destroy the rights and privileges granted to said company."

Section 11 provides for the laying of tracks to the fair grounds or other places of resort after the year 1875. Section 12 provides for annual reports by the company to the city treasurer, of the receipts of the company for the previous year, and for the levy of a tax thereon for city purposes. Section 13 contains regulations as to the speed and movement and equipment of cars. Section 14 has reference to acceptance by the grantee company.

In substance, this is the entire ordinance as originally passed, with some immaterial amendments, one of which was passed in February of the year 1872. Another amendment was passed in 1879, which, as we understand it, authorized the company to use steam as a motive power; and some other amendments were made, which will be referred to during the

course of the opinion. The two sections referring to time are
1 and 10, before quoted. And plaintiff contends that by the
use of the italicized words in section 1, ''and for the time,''
the city manifested an intention that the franchise should be
limited as to the time of its duration, and that, as the only
other words with reference to duration are fixed in section 10
as thirty years, the proper and only construction of the grant
is that it was for thirty years, and that it was an exclusive
grant for that period. On the other side, it is argued with
just as much confidence that the grant was unlimited as to
time, save that for thirty years it was to be exclusive to the
company, and that, after the expiration of that period, it
should be open to franchises for like purposes to other per-
sons or corporations. It bases this argument, first, on the
grammatical construction of the language used, upon certain
testimony as to what the parties receiving the grant under-
stood it to be, the practical construction placed upon it by the
parties in interest, and upon certain other matters to be here-
inafter mentioned. Manifestly we must strike out the words
''and for the time'' appearing in the first section, or say that,
in virtue of the subsequent language of the franchise, the
framers made the period thirty years, or either forgot to fix
the time of the grant or intentionally left it unlimited with
the idea in mind that it would be unlimited and perpetual.
Either this, or adopt another rule, contended for by the coun-
sel for the railway company, to the effect that the ordinance
is ambiguous and subject to several constructions, in which
event we should, from oral testimony as to what was intended
and as to the practical construction put upon it by the parties
thereto, find that the ordinance was intended to be unlimited
and perpetual or indeterminate, or that it should be construed
to extend for the thirty-year period and be so interpreted as to
last either for the lifetime of the corporation to which granted,
or of its successors in interest, or so indefinite as to be inde-
terminate. This last contention is not relied upon by counsel
in their briefs, and it is merely suggested in passing. As

already stated, counsel for the street railway are relying upon an estoppel due to the conduct of the city; but this has such close relation to the doctrine of practical construction that we pass it now for further consideration hereafter. At the outset of this part of the discussion, we may say that some of the members of the court are of opinion that there is no ambiguity in the words of this franchise. That, by section 1 of the ordinance, the grant is expressly limited as to time, and that as the only other mention of time is found in section 10, the grant is of necessity limited to the period of thirty years, and that the franchise expired January 1, 1898.

While recognizing the force of the suggestion that section 10 might, in virtue of some of the language used, be construed to mean that the original grantees still had some rights upon the streets after the expiration of the thirty years, yet, as this is to be gathered from mere inference, we feel that such an interpretation should not, under well-settled canons of construction, be placed upon it. Reliance is placed upon the following lucid statement of the rule applied to a like situation in *Detroit Citizens' Co. v. Detroit Ry. Co.*, 171 U. S. 48 (18 Sup. Ct. 732, 43 L. Ed. 67):

2. MUNICIPAL CORPORATIONS: franchises: extent of power.

Did it get such power from the Legislature? It is contended that it did, by the act under which the Detroit City Railway Company, the predecessor of plaintiff in error, was organized, and to whose rights and franchises it succeeded. This act is the tram railway act, and, at the time of the adoption of the first ordinance in 1862, section 34 of that act provided that 'all companies or corporations formed for such purposes [the railway purposes mentioned in the act] shall have the exclusive right to use and operate any railways constructed, owned or held by them: Provided, that no such company or corporation shall be authorized to construct a railway, under this act, through the streets of any town or city, without the consent of the municipal authorities of such town or city, and under such regulations and upon such terms and conditions as said authorities may from time to time prescribe.'

In 1867 the further proviso was added that, after such consent should be given and accepted, such authorities should make no regulations or conditions whereby the rights or franchises so granted should be destroyed or unreasonably impaired, or such company be deprived of the right of con-structing, maintaining, and operating such railway.

It is clear that the statute did not explicitly and directly confer the power on the municipality to grant an exclusive privilege to occupy its streets for railway purposes. It is urged, however, that such power is to be inferred from the provision which requires the consent of the municipal authorities to the construction of a railway under such terms as they may prescribe, combined with the provisions of the Constitution, which, if they do not confer a power independent of the Legislature, strongly provide for and intend local government. The argument is strong, and all of its strength has been presented, and is appreciated; but there exist considerations of countervailing and superior strength. That such power must be given in language explicit and express, or necessarily to be implied from other powers, is now firmly fixed. There were many reasons which urged to this; reasons which flow from the nature of the municipal trust, even from the nature of the legislative trust, and those which, without the clearest intention explicitly declared, insistently forbid that the future should be committed and bound by the conditions of the present time, and functions delegated for public purposes be paralyzed in their exercise by the existence of exclusive privileges. The rule and the reason for it are expressed in *Minturn v. Larue,* 23 How. 436 (16 L. Ed. 574); *Wright v. Nagle,* 101 U. S. 791 (25 L. Ed. 921); *Ohio v. Cincinnati Gaslight & Coke Co.,* 18 Ohio St. 262; *Parkhurst v. City of Salem,* 23 Or. 471 (32 Pac. 304); *Saginaw Gaslight Co. v. City of Saginaw* (C. C.) 28 Fed. 529 (decided by Mr. Justice Brown of this court); *Long v. City of Duluth,* 49 Minn. 280 (51 N. W. 913, 32 Am. St. Rep. 547). See, also, *Grand Rapids Electric Light & Power Co. v. Grand Rapids Edison Electric Light & Fuel-Gas Co.* (C. C.) 33 Fed. 659 (opinion delivered by Mr. Justice Jackson at circuit). As bearing on the rule, see, also, *Oregon Ry. Co. v. Oregonian Ry. & Nav. Co.,* 130 U. S. 1 (9 Sup. Ct. 409, 32 L. Ed. 837); *Central Transp. Co. v. Pullman Palace Car Co.,* 139 U. S. 24 (11 Sup. Ct. 478, 35 L. Ed. 55).

The power, therefore, must be granted in express words, or necessarily to be implied. What does the latter mean? Mr. Justice Jackson, in *Grand Rapids Electric Light & Power Co. v. Grand Rapids Edison Electric Light & Fuel-Gas Co., supra,* says: . . . That municipal corporations possess and can exercise only such powers as are 'granted in *express words,* or those *necessarily or fairly* implied *in, or incident to, the powers expressly conferred, or those essential to the declared objects and purposes of the corporation, not simply convenient, but indispensable.*' [The italics are his.] This would make 'necessarily implied' mean 'inevitably implied.' The Court of Appeals of the Sixth Circuit, by Circuit Judge Lurton, adopts Lord Hardwick's explanation, quoted by Lord Eldon in *Wilkinson v. Adam,* 1 Ves. & B. 466, that 'a *necessary implication* means, not natural necessity, but so strong a probability of an intention that one contrary to that which is imputed to the party using the language cannot be supposed.' If this be more than expressing by circumlocution an inevitable necessity, we need not stop to remark, or, if it means less, to sanction it, because we think that the statute of Michigan tested by it, does not confer on the common council of Detroit the power it attempted to exercise in the ordinance of 1862. To refer the right to occupy the streets of any town or city to the consent of its local government was natural enough—would have been natural under any Constitution not prohibiting it—and the power to prescribe the terms and regulations of the occupation derives very little, if any, breadth from the expression of it. But, assuming the power to prescribe terms does acquire breadth from such expression, surely there is sufficient range for its exercise, which stops short, or which, rather, does not extend to granting an exclusive privilege of occupation. Surely there is not so strong a probability of an intention of granting so extreme a power that one contrary to it cannot be supposed, which is Lord Hardwick's test, or that it is indispensable to the purpose for which the power is given, or necessarily to be implied from it, which is the test of the cases. The rule is one of construction. Any grant of power in general terms, read literally, can be construed to be unlimited; but it may, notwithstanding, receive limitation from its purpose, from the general purview of the act which confers it. A municipality is a governmental agency; its functions are for the public good; and the powers

given to it, and to be exercised by it, must be construed with reference to that good, and to the distinctions which are recognized as important in the administration of public affairs.

Easements in the public streets for a limited time are different, and have different consequences, from those given in perpetuity. Those reserved from monopoly are different, and have different consequences, from those fixed in monopoly. Consequently those given in perpetuity and in monopoly must have for their authority explicit permission, or, if inferred from other powers, it is not enough that the authority is convenient to them, but it must be indispensable to them.

See, also, to same effect: *Blair v. Chicago,* 201 U. S. 400, (26 Sup. Ct. 427, 50 L. Ed. 801) ; *Turnpike Co. v. People,* 96 U. S. 63, (24 L. Ed. 651).

3. SAME: construction of grants.
As a corollary to this rule is another, well settled by authority, to the effect that all grants and franchises are to be strictly construed against the grantee thereof.

In *Blair v. Chicago, supra,* the Supreme Court of the United States said:

We may premise, before taking up this act for more detailed consideration, that it is a firmly established rule, which we shall have occasion to refer to later on in this discussion, but which must be borne in mind as we enter upon the consideration of this act, that one who asserts private rights in public property, under grants of the character of those under consideration, must, if he would establish them, come prepared to show that they have been conferred in plain terms, for nothing passes by the grant except it be clearly stated or necessarily implied. . . .

Legislative grants of this character should be in such unequivocal form of expression that the legislative mind may be distinctly impressed with their character and import in order that the privileges may be intelligently granted or purposely withheld. It is matter of common knowledge that grants of this character are usually prepared by those interested in them, and submitted to the Legislature with a view to obtain from such bodies the most liberal grant of privileges which they are willing to give. This is one among

many reasons why they are to be strictly construed. *Pierce on Railroads*, 491; *New Orleans & C. R. Co. v. New Orleans*, 34 La. Ann. 447. 'Words of equivocal import,' said Mr. Chief Justice Black in *Pennsylvania R. Co. v. Canal Com'rs*, 21 Pa. 9, 22, 'are so easily inserted by mistake or fraud that every consideration of justice and policy requires that they should be treated as nugatory when they do find their way into the enactments of the Legislature.' 'The just presumption,' says Cooley in his work on Constitutional Limitations (7th Ed.) p. 565, 'in every such case, is that the state has granted in express terms all that it designed to grant at all,' and, after quoting from the Supreme Court of Pennsylvania to the same effect, the learned author observes: 'This is sound doctrine, and should be vigilantly observed and enforced.'

Since the decision in *Dartmouth College v. Woodward*, 4 Wheat. 518 (4 L. Ed. 629), this court has had frequent occasion to apply and enforce the doctrine that a grant of rights in public property, accepted by the beneficiary, will amount to a contract entitled to protection against impairment by action of the state or municipalities acting under state authority. Concurrent with this principle, and to be considered when construing an alleged grant of this character, is the equally well-established rule which required such grants to be made in plain terms in order to convey private rights in respect to public property, and to prevent future control of such privileges in the public interest. The rule as laid down with clearness by Chief Justice Taney in the often-cited case of *Charles River Bridge v. Warren Bridge*, 11 Pet. 420 (9 L. Ed. 773), and has been uniformly applied in many subsequent cases in this court. In *Perrine v. Chesapeake & D. Canal Co.*, 9 How. 172–192 (13 L. Ed. 92–100), the same eminent Chief Justice, speaking for the court, said: 'The rule of construction in cases of this description is this: That any ambiguity in the terms of the grant must operate against the corporation, and in favor of the public, and the corporation can claim nothing that is not clearly given by the law. We do not mean to say that the charter is to receive a strained and unreasonable interpretation, contrary to the obvious intention of the grant. It must be fairly examined and considered, and reasonably and justly expounded.' In the case of the *Binghamton Bridge* (*Chenango Bridge Co.*)

*v. Binghampton Bridge Co.,* 3 Wall. 51, 75 (18 L. Ed. 137, 143), it was said: 'The principle is this: That all rights which are asserted against the state must be clearly defined, and not raised by inference or presumption; and, if the charter is silent about a power, it does not exist. If, on a fair reading of the instrument, reasonable doubts arise as to the proper interpretation to be given to it, those doubts are to be solved in favor of the state; and where it is susceptible of two meanings, the one restricting and the other extending the powers of the corporation, that construction is to be adopted which works the least harm to the state.'

This principle has been declared axiomatic as a doctrine of this court. *Northwestern Fertilizing Co. v. Hyde Park,* 97 U. S. 659, 666 (24 L. Ed. 1036, 1038). In *Slidell v. Grandjean,* 111 U. S. 412, 438 (4 Sup. Ct. 475, 487, 28 L. Ed. 321, 330), it is declared a wise doctrine; 'it serves to defeat any purpose concealed by the skillful use of terms to accomplish something not apparent on the face of the act, and thus sanctions only open dealing with legislative bodies.' Among other cases affirming the principle in this court is *Coosaw Mining Co. v. South Carolina,* 144 U. S. 550 (12 Sup. Ct. 689, 36 L. Ed. 537), in which it was applied in adopting, of two doubtful constructions, the one more favorable to the state. Many of the cases are cited in a note to *Knoxville Water Co. v. Knoxville,* decided at this term, 200 U. S. 22, 34 (26 Sup. Ct. 224, 227, 50 L. Ed. 353). Applying the principle so frequently asserted and uniformly maintained, we think it cannot be successfully maintained that the act of 1865 contains a clear expression of legislative intention to extend the franchise of these companies to use the streets of Chicago, without reference to the assent of the city, for the long term of 99 years, and for that time preventing other and different legislation restricting this grant of a practically exclusive right. So enormous a grant of privileges, including an exclusion from some streets of any railway system, ought not to be presumed or held to be conferred by doubtful and ambiguous words. Grants of this character are not to be destroyed by an unreasonable or narrow interpretation. But if ambiguity is fatal to such claim of rights as against the public, for the stronger reason must such grants of far-reaching and exclusive privileges as are here

asserted fail when they can only be maintained by strained construction in their favor. . . .

In the west side system, the ordinance of August 17, 1864, is silent as to the term of the grant. We do not think this indicates any intention on the part of the city, even if it had the power under legislative acts then in existence, to confer the right in perpetuity to the occupancy of the streets—a point which we do not feel called upon to decide. The other ordinances by direct terms or references to prior ordinances have made the grants for the west side system for the term of twenty-five years, and until purchased by the city in the manner stated; and we do not think there was any intention to depart from the plan in this one ordinance, omitting specifically to name a definite time of occupancy. At this time there had been no extension of the life of the corporation, and it was specifically limited to twenty-five years.

In reaching this conclusion we are not unmindful of the decision of this court in *Detroit v. Detroit Citizens' Street R. Co.*, 184 U. S. 368, 395 (22 Sup. Ct. 410, 46 L. Ed. 592, 610), holding that, although a corporation be organized for a limited period by the terms of its charter, it may receive a grant which would inure to the benefit of those lawfully entitled to succeed to the rights of the corporation, although for a period of years beyond the corporate life. But in the present case the right granted must be construed with reference to the system of which it was made a part; and where the terms of the grant were limited to 25 years, and until purchase, we can find no intention to grant or receive a perpetuity simply because no term of years was named in the one ordinance under consideration.

In *City of Joseph v. Joseph Water Works Co.*, 57 Or. 586, (111 Pac. 864), the Supreme Court of Oregon said:

It is a rule of construction that, if the terms of the franchise are doubtful, they are to be construed strictly against the grantee and liberally in favor of the public. What is not unequivocally granted is withheld, and nothing passes by implication, except what is necessary to carry into effect the obvious intent of the grant. 19 Cyc. 1559; Joyce on Franch. section 23; *Water, Light & Gas Co. v. Hutchinson*,

207 U. S. 385 (28 Sup. Ct. 135, 52 L. Ed. 257) ; *Birmingham & Pratt Mines St. Ry. Co. v. Birmingham St. Ry. Co.,* 79 Ala. 465 (58 Am. Rep. 615).

The *Dartmouth College case,* 4 Wheat. 518 (4 L. Ed. 629), cited by defendant, is not in point for the reason that it relates to a franchise created by sovereign power. And we hold that section 4 fixes the duration of the franchise at 15 years. If, as defendant contends, the duration of the franchise in terms is perpetual, then, as we have seen, it is void, and is no protection to defendant for the acts complained of here. This was expressly held in *Westminster Water Co. v. Westminster,* 98 Md. 551 (56 Atl. 990, 64 L. R. A. 630, 103 Am. St. Rep. 424), where the contract was unlimited as to time. The court held that it was a contract in perpetuity, and therefore void, and that the court cannot make a new contract between the parties for a limited period. *Cedar Rapids Water Co. v. Cedar Rapids,* 118 Iowa, 241: *Logansport Ry. Co. v. City of Logansport* (C. C.) 114 Fed. 688. A contract which is beyond the power of the city to make is void. *State ex rel. v. Minnesota T. Ry. Co.,* 80 Minn. 108 (83 N. W. 32, 50 L. R. A. 656) ; *Flynn v. Little Falls Electric & Water Co.,* 74 Minn. 180 (77 N. W. 38, 78 N. W. 106) ; *Milhau v. Sharp,* 27 N. Y. 611 (84 Am. Dec. 314).

Again, in *East Ohio Gas Co. v. Akron,* 81 Ohio, St. 33, (90 N. E. 40, 26 L. R. A. [N. S.] 92, 18 Ann. Cas. 332), the Supreme Court of Ohio, said:

It is true that the ordinance grants the right to enter and occupy the streets; but, in respect to the time when it shall terminate its occupancy and withdraw, the ordinance is silent. May we infer from this silence that the gas company has a perpetual franchise in the streets? We are not now prepared to hold that the company has thus acquired such a perpetual franchise; and we feel quite sure that even the defendant in error, on more mature reflection, would not insist upon such a conclusion. This court laid down as the law, in *Wabash R. Co. v. Defiance,* 52 Ohio St. 262, 307 (40 N. E. 89, 100), that: 'Every grant in derogation of the right of the public in the free and unobstructed use of the streets, or restrictive of the control of the proper agencies of the municipal body over them, or of the legitimate exer-

cise of their powers in the public interest, will be construed strictly against the grantee, and liberally in favor of the public, and never extended beyond its express terms when not indispensable to give effect to the grant.' The doctrine, as well as the judgment, in this case was affirmed in *Wabash R. Co. v. Defiance,* 167 U. S. 88 (17 Sup. Ct. 748, 42 L. Ed. 87). The same rule of construction was approved and followed in *Blair v. Chicago,* 201 U. S. 400 (26 Sup. Ct. 427, 50 L. Ed. 801), and in *Cleveland Electric R. Co. v. Cleveland,* 204 U. S. 116 (27 Sup. Ct. 202, 51 L. Ed. 399).

It comes, then, to this: That, in the absence of limitations as to time, the termination of the franchise is indefinite; and, to preserve mutuality in the contract, the franchise can continue only so long as both parties are consenting thereto. Or, to state it concretely, the contract being silent as to the duration of the franchise, and the ten-year agreement as to the price of gas having expired, the city may, under its power of regulation, impose new conditions as to price, and the gas company may accept or reject these. If the refusal to comply is final, the company necessarily incurs the penalty of forfeiture of its franchise to serve the people of the city; but on the other hand, there being no provision to that effect in the original contract, the city cannot directly or indirectly deprive the gas company of its property without due process of the law, when the latter withdraws from the further exercise of its franchise. *Cleveland Electric R. Co. v. Cleveland, supra.* In accord with sections 2478, 2479, Rev. Stat. Ohio 1880, in No. 6 of the ordinance, the parties entered into an agreement regulating the price of gas for ten years from and after the passage of the ordinance, and, so far as it appears in this record, this agreement has been faithfully kept by both parties, and it is not now a subject of controversy. But it has been suggested, rather than argued, that this clause in the ordinance, viz., 'And the council of said city of Akron shall not, during the period of ten years from and after the passage of this ordinance, pass any ordinance fixing or attempting to fix the rates at which gas shall be supplied, at any lower price that these set forth,' raises an implied contract that the city may regulate the price after the expiration of the ten-year term. When the written contract is silent in regard to a matter of so much importance to both parties, it is not to be lightly presumed that it was intended

to imply an agreement upon that point. The implication should clearly appear from the whole instrument. While the courts will give effect to that which clearly appears to be the intention of the parties, yet the safe rule appears to be as stated by Lord Cockburn in *Churchward v. R. L. R.*, 1 Q. B. 173, 195, 196, as follows: 'But in all these instances where a contract is silent, the court or jury who are called upon to imply an obligation on the other side, which does not appear in the terms of the contract, must take great care that they do not make the contract speak where it was intentionally silent; and above all that they do not make it speak entirely contrary to what, as may be gathered from the whole terms and tenor of the contract, was the intention of the parties. This I take to be a sound and safe rule of construction with regard to implied covenants and agreements which are not expressed in the contract.'

Keeping in mind this rule of construction, it seems to us that undoubtedly the city may regulate the price of gas after the expiration of the ten-year term expressed in the contract, if the gas company continues to exercise its franchise in the city; but it may do so, not by virtue of the contract, but by virtue of the statute which empowers the city council to fix the price for a period not exceeding ten years. Having done so for a period of ten years from September 26, 1898, its power was not exhausted; but, so long as the gas company continues to exercise its franchise within the city, the council may fix the price for any period not exceeding ten years, and so on until the gas company discontinues.

It will be noticed that this quotation covers many of the questions we have been considering, and that it, in effect, rules that the gas company held an indeterminate franchise. The rule announced in the authorities from which we have just quoted was promulgated at a very early day in this state in *Miners' Bank v. United States*, 1 G. Greene, 562, in the following language:

There appears to be no rule of construction better established in the English books than that 'public grants are construed strictly in favor of the king'; and in this country, in all conflicts between the sovereign power and grantees

enjoying exclusive privileges conferred upon them by acts of incorporation, the same rule of construction prevails. See *United States v. Arrendondo et al.,* 6 Pet. 738 [8 L. Ed. 547] ; also *Charles River Bridge v. Warren Bridge et al.,* 11 Pet. 514 (9 L. Ed. 773).

Counsel for the street railway challenge the applicability of these rules to the instant case for the reason that this grant was a contract entered into between the city and the street railway company with reference to the private and proprietary interests of the city, and that the rule applicable to contracts should apply, to the effect that the grant should be construed as the grantor had reason to believe the grantee understood it to mean; and, in accord with this claim, they introduced testimony to show the understanding of the original grantee and those acting for it at the time the original ordinance was granted, and subsequent thereto. This argument, to say the least of it, is plausible; but we do not think it will stand analysis.

In the granting of franchises for the use of its streets and highways by street railways, waterworks, electric light, and telephone or other public service companies, a city is

4. SAME: contracts: franchises: distinction.

not ordinarily acting in a private or proprietary capacity, or as a corporation for pecuniary profit, but as an instrumentality of government acting as an agent for the state in a sovereign capacity. Its franchise is in effect a grant from the state, and by all the authorities is to be interpreted as such. In contracting with water companies for water for fire or other purposes, and with electric light companies for lighting its streets and in other such matters, it is acting in a private and proprietary capacity, and the rule for which counsel contend is generally held applicable to such cases. This distinction is pointed out in many cases, and is bottomed upon fundamental and axiomatic principles. See *Edson v. City of Olathe,* 81 Kan. 328, (105 Pac. 521, 36 L. R. A. [N. S.] 861) ; *State v. Des Moines R. R.,* 135 Iowa, 694; 1 Dillon on Municipal Corp.

(4th Ed.) section 308; *Walla Walla v. Water Co.*, 172 U. S. 1, (19 Sup. Ct. 77, 43 L. Ed. 341); *Culver v. Streator*, 130 Ill. 238, (22 N. E. 810, 6 L. R. A. 270); *Illinois T. & S. Bank v. Arkansas City*, 76 Fed. 271, (22 C. C. A. 171, 34 L. R. A. 518); *Des Moines Co. v. Des Moines*, 44 Iowa, 505; *Gadsden v. Mitchell*, 145 Ala. 137, (40 South. 557, 6 L. R. A. [N. S.] 781, 117 Am. St. Rep. 20). The opinion of Burch, J., in *Edson* case, *supra*, clearly elucidates this thought. See, also, valuable notes to *Elizabeth City v. Banks*, 22 L. R. A. (N. S.) 925. As already indicated, some of the members of the court are of opinion that under these rules the franchise of the defendant company expired on January 1, 1898.

II.    Aside from this, however, we all believe that the same result should be reached upon a somewhat different theory. As heretofore indicated, we are of the opinion that a city, in granting a franchise for the use of the streets and highways therein, is acting in a sovereign capacity, and has such powers and such only as are expressly given or arise by necessary implication from those granted. Concession is made that, prior to the adoption of the Code of 1873, the city of Des Moines had no right or authority to grant any franchise to a street railway upon its streets or highways. In the adoption of that Code, the Legislature provided that: ''They [cities and towns] shall also have the power to authorize or forbid the location and laying down of tracks for railways and street railways on all streets, alleys and public places; but no railway track can thus be located and laid down until after the injury to property abutting upon the street, alley or public places upon which such railway track is proposed to be located and laid down, has been ascertained and compensated in the manner provided for taking private property for works of internal improvements.'' Code 1873, section 464. It was in virtue of this act that the city council of Des Moines re-enacted the ordinance passed in the year 1866. Prior to that time, the most that defendant can successfully assert is that it was a licensee

5. SAME: street railways: invalid grant: effect.

under the original ordinance down until the time of the re-enactment thereof. The re-enactment did not in any manner change the period of the grant. That was fixed in the original ordinance, and the date for the begining of that period was fixed. It was in effect, then, a grant for at least twenty-four years; and if for no longer a period, that grant was exclusive. But as heretofore suggested, this exclusive period, under any theory, has long since passed, and the only question remaining is, Does the ordinance grant to the street railway a perpetual franchise for all time upon the streets of the city of Des Moines? Defendant's counsel, for reasons already stated, seriously and ably contend that it does, and they cite, in support of their contention, *People v. O'Brien,* 111 N. Y. 1, (18 N. E. 692, 2 L. R. A. 255, 7 Am. St. Rep. 684), which it must be conceded supports their contention, although there is much reason for saying that that decision really turned upon the nature of a legislative grant, and did not involve the power of a city council, under delegated authority from the Legislature, to make a grant in perpetuity without express legislative authority. Generally speaking, the other authorities cited in support of the claims made by the street railway are not in point for reasons hereinafter stated. Aside from the *O'Brien* case, there is no other, we think, which gives to a city, acting under such delegation of power as here appears, authority to make a perpetual and permanent grant, save *Des Moines R. R. v. Des Moines* (C. C.) 151 Fed. 854, and perhaps *National Co. v. Kansas City* (C. C.) 65 Fed. 691. The former of these cases was dismissed by the Supreme Court of the United States in 214 U. S. 179, (29 Sup. Ct. 553, 53 L. Ed. 958), for want of jurisdiction, and is therefore not an authority; and the latter, if it decides the point at all, is not persuasive. This is the view expressed by the latest authority on the subject, which we have been able to find. See McQuillin on Municipal Corp. section 1654 *et seq.*, and cases cited.

Before going more deeply into the subject, it is well, perhaps, in this connection to differentiate between cases of

legislative grant directly from the Legislature, which express, from time to time, the public policy of the state, and are in no way limited, save by the Constitution itself; and general delegations of power to municipalities to grant franchises, without any express limitations or conditions.

A company or corporation may doubtless operate a street railway upon the streets or highways of a city under an ordinance or resolution of the city, permitting it so to do, without express legislative authority, for under our holdings such occupancy is not an additional servitude. But such operation and occupancy would be nothing more than a mere license, terminable at pleasure, and the tracks, etc., would at all times be subject to removal, as a nuisance, by any citizen specially injured or by the city or state itself.

The Legislature itself may either in the act creating a corporation or by special grant confer upon any person or corporation a franchise to use and occupy the streets, highways, and public places of a city without any other limitations than those found in the act itself, or in the Constitution of the state. And save as restrained by the fundamental law, its powers in this respect are plenary and without limit. It may therefore grant exclusive, as well as permanent and perpetual franchises. The Constitutions of some of the states seem to limit the powers of the Legislature in these respects; but we shall not take the time here to cite them. Our own Constitution has these provisions, and none other, with reference to these matters: "All laws of a general nature shall have a uniform operation; the General Assembly shall not grant to any citizen or class of citizens, privileges, or immunities, which upon the same terms shall not equally belong to all citizens. . . . Subject to the provisions of this article, the General Assembly shall have power to amend or repeal all laws for the organization or creation of corporations, or granting of special or exclusive privileges or immunities, by a vote of two-thirds of each branch of the General Assembly; and no exclusive privileges

6. SAME: grant of franchise: limitation of power.

except as in this article provided, shall ever be granted."
These sections have heretofore been held inapplicable to exclusive franchises granted by municipal corporations for a reasonable time. See *Des Moines R. R. v. Des Moines St. R. R.*, 73
Iowa, 523. And it has also been said that any change of franchise rights must be reasonable. *Des Moines v. Des Moines
Water Wks. Co.*, 95 Iowa, 348.

We point to these constitutional provisions now to show
that the makers of our fundamental law were opposed to the
granting of special privileges and monopolies, although not
intending to limit the right of the Legislature to provide, if
it were so minded, for the making of franchises by a city or
other municipality for a reasonable length of time, even
though they might be exclusive in character. They are also
referred to as evidencing the thought of the people that monopolies and special privileges are odious. Indeed, from time immemorial, monopolies have been under the ban of the law.

A Legislature may also give to a city or other municipality the right to grant franchises and may prescribe, limit,
and fix the terms of the grant. If the act granting this power
is unlimited as to time or conditions, then the
municipality has such powers as are expressed
or necessarily implied, but no more. When
the language is general, regard must be had of the reasonableness or unreasonableness of the grant, and to that end public
policy may be a controlling factor. Indeed it is quite generally
held that all ordinances must be reasonable, although in such
cases a rather wide discretion is necessarily lodged in the
city. Because of the fact that special privileges are obnoxious
and monopolies odious, it is generally held by the courts of
this country that, under such power as our Legislature has
conferred, a municipality may fix the duration of the franchise at any reasonable length of time, and that the courts will
not too narrowly scrutinize the franchise in this respect; but
that, under such general grant of authority, a city council
cannot grant a perpetual and permanent franchise. See, as

7. SAME: grant
of franchise:
scope of municipal power.

supporting these rules, *Cedar Rapids Co. v. Cedar Rapids,* 118 Iowa, 234; *Houston v. Houston R. R.,* 83 Tex. 548, (19 S. W. 127, 29 Am. St. Rep. 679); *Birmingham St. R. Co. v. Birmingham Co.,* 79 Ala. 465, (58 Am. Rep. 615); *Joseph v. Joseph Water Co.,* 57 Or. 589, (111 Pac. 864); *Barre v. Perry,* 82 Vt. 301, (73 Atl. 574); *Boise City v. Water Co.,* 186 Fed. 705, (108 C. C. A. 523); *Logansport Co. v. Logansport* (C. C.) 114 Fed. 688; *Detroit v. Detroit R. R.,* 171 U. S. 48, (18 Sup. Ct. 732, 43 L. Ed. 67); *Lackey v. Fayetteville Co.,* 80 Ark. 108, (96 S. W. 622); *Omaha Water Co. v. Omaha,* 147 Fed. 1, (77 C. C. A. 267, 12 L. R. A. [N. S.] 736, 8 Ann. Cas. 614); *Omaha Electric Co. v. Omaha,* 179 Fed. 455, (102 C. C. A. 601); *Grand Rapids v. Grand Rapids Co.* (C. C.) 33 Fed. 659 (opinion by Justice Jackson). We shall here quote from some of these cases to show the logic of the opinions.

In *Cedar Rapids Water Co. v. Cedar Rapids,* 118 Iowa, 241, we said:

Grants or franchises in perpetuity or for unreasonably long periods of time are generally regarded as against public policy; and, if ever valid, the authority therefor must be found in the Constitution or statutes of the state. *Richmond County Gas Light Co. v. Town of Middletown,* 59 N. Y. 228; *City of Brenham v. Brenham Water Co.,* 67 Tex. 542 (4 S. W. 143); *Long v. City of Duluth,* 49 Minn. 280 (51 N. W. 913, 32 Am. St. Rep. 547); *Thrift v. Elizabeth City,* 122 N. C. 31 (30 S. E. 349, 44 L. R. A. 427).

In *City of Barre v. Perry,* 82 Vt. 308, (73 Atl. 576), the Supreme Court of Vermont said:

But it is said that a municipal grant of a privilege for an indefinite time gives the recipient no vested right to its enjoyment for any time. It is true that the city council could not grant this privilege in perpetuity. It is true that one dealing with a city council is bound to know the extent of its authority, whether determined by statutory provision or by common-law rules. There are cases which involve the

validity of municipal contracts entered into for a specified time which was in excess of a specified time fixed by the charter, and some of these hold the contract wholly invalid, while others hold it void only for the excess. Here no limit is fixed by the charter, and none is specified in the permit, and the grant may properly be restricted to and sustained for a reasonable time—a time that will satisfy the requirements of equity.

In *City v. Joseph Water Works Co.*, 57 Or. 589, (111 Pac. 865), the Supreme Court of Oregon said:

It is further contended by plaintiff that the municipality cannot grant an exclusive franchise without special authority from the Legislature. This is conceded by defendant, it contending only that the franchise is perpetual, while plaintiff insists that section 4 of the ordinance limits its duration to fifteen years, and this is the principal ground of contention between them. A municipality cannot, at least without statutory authority, grant a perpetual utility franchise. It is said in *Cedar Rapids Water Co. v. Cedar Rapids*, 118 Iowa, 234, that: 'Grants of franchises in perpetuity or for unreasonably long periods of time are generally regarded as against public policy; and, if ever valid, the authority therefor must be found in the Constitution or statutes of the state.' See, also, 28 Cyc. 655, 875; Cooley's Const. L. (6th Ed.) 251; *Citizens' St. Ry. v. Detroit Railway*, 171 U. S. 48 (18 Sup. Ct. 732, 43 L. Ed. 67) ; *Brenham v. Water Co.*, 67 Tex. 542 (4 S. W. 143) ; *Illinois Trust & Savings Bank v. Arkansas City Water Co.* (C. C.) 67 Fed. 196; *Logansport Ry. Co. v. City of Logansport* (C. C.) 114 Fed. 688. It is said in *Birmingham & Pratt Mines St. Ry. Co. v. Birmingham St. Ry. Co.*, 79 Ala. 472 (58 Am. Rep. 615) : Judge Cooley adopts the view that a municipal corporation cannot, 'without explicit legislative consent,' permit the construction of a street railway in its streets, and confer on the projectors 'privileges exclusive in their character, and designed to be perpetual in duration.' . . . No reason is perceived why this principle is not entirely sound and in strict conformity to every rule pertaining to the true functions of municipal corporations. . . . They have no implied power to barter away to-day, as a monopoly to one, that which the public

necessities of a growing city may require to be reserved, in order that it may be exercised for the public benefit on to-morrow. (See, also, note to *Huron Waterworks Co. v. City of Huron* (S. D.) 12 Am. R. R. & Corp. Rep. 398; *Westminster Water Co. v. Westminster*, 98 Md. 551 (56 Atl. 990, 64 L. R. A. 630, 103 Am. St. Rep. 424).

Thus we see that the town was powerless to grant a perpetual franchise, and it cannot be presumed that it intended to do so. On the contrary, it seems, from the terms of the ordinance, that it considered that the right granted by section 1 of the ordinance might be terminated by the town at any time; hence the provision of section 4 fixing the time of its duration at fifteen years. The effect of the limitation contained in section 4 is the same as if it had been inserted in section 1, viz., granting the exclusive right and franchise for the term of fifteen years. It limits to that term whatever right or franchise is granted by section 1; otherwise section 4 is meaningless.

The case from which this quotation is made is quite in point here because of the similarity in the ordinances. In the ordinance there considered there was an apparently unlimited grant in the first section of the franchise, and this was followed by another section reading as follows:

"And further to encourage the enterprise of said water system of the said town of Joseph, we, the common council, do hereby agree to grant the exclusive right to said company for a term of fifteen years, commencing January 1, 1894."

We have already made quotations from the *East Ohio Gas Co.* case in 26 L. R. A. (N. S.) 92, and need not repeat them here. As will be noticed they are in line with those just quoted.

In *Mayor v. Houston*, 83 Tex. 555, (19 S. W. 129, 29 Am. St. Rep. 679), the Supreme Court of Texas said:

In reference to the second proposition submitted by the appellants, we hold that, as the common council had legislative authority to grant the franchise in question, its duration was a matter for their exclusive determination,

Whether it should be extended for two, five, or thirty years was left to their wisdom and discretion. They could not, perhaps, abandon or transfer their ordinary control over the streets of a legislative character, so as to prevent the proper and legitimate exercise of this authority by their successors in office. But this, as we have seen, they did not do. Nor was it in the power of the common council to create a perpetuity. Subject to these limitations, however, the wisdom and reasonableness of the grant, and the length of time during which it should continue, were addressed solely to the good judgment of the members of the common council. 1 Dill. Mun. Corp. Section 95.

In *Boise City v. Boise Water Co.*, 186 Fed. 705, (108 C. C. A. 523,) the Circuit Court of Appeals of the Ninth Circuit said:

In effect the provisions of that ordinance were precisely similar to those of the previous ordinance of October 3, 1889, granting to Eastman Bros., also predecessors in interest of the defendant in error, similar rights, which were held by this court in the case of *Boise City Artesian Hot & Cold Water Co. v. Boise City*, 123 Fed. 232 (59 C. C. A. 236), to have conferred on the Eastmans a license merely, revocable at the pleasure of the city; we there saying: 'The ordinance of October, 1889, granted permission to the Eastmans and to their successors in interest to lay and repair their pipes in the streets of the city, and to furnish water to the inhabitants thereof. No term was fixed for the duration of the privilege. It is plain that the ordinance was either the grant of a license revocable at the will of the grantor, or, by its acceptance on the part of the grantee, it became an irrevocable and perpetual contract. No middle ground is tenable between these two constructions. In the Constitution of nearly all the states it is provided that no exclusive or perpetual franchises shall be granted; and, irrespective of such constitutional limitation, it is clear, both upon reason and authority, that no municipal corporation, in the absence of express legislative authority, has power to grant a perpetual franchise for the use of its streets. The city of Boise was incorporated by the territorial Legislature of Idaho on January 11, 1866. It was given power 'to provide the city with

good and wholesome water,' and to erect or construct 'such waterworks. and reservoirs within the established limits of the city as may be necessary or convenient therefor.' There can be no doubt that under this provision of its charter the city had the power to grant the use of its streets for a fixed reasonable period of time, either to an individual or to a corporation, for the purpose of furnishing a water supply to the inhabitants. It had no authority, however, to make a perpetual contract. A municipal corporation, intrusted with the power of control over its public streets, cannot, by contract or otherwise, irrevocably surrender any part of such power without the explicit consent of the Legislature. Cooley's Constitutional Limitations (2d Ed.) 205, 210; Dillon on Municipal Corporations, Sections 715, 716; *Barnett v. Denison*, 145 U. S. 135, 139 (12 Sup. Ct. 819, 36 L. Ed. 652). And legislative grants of powers to municipal corporations are to be so strictly construed as to operate as a surrender of the sovereignty of the state no further than is expressly declared by the language thereof. *Charles River Bridge Co. v. Warren Bridge*, 11 Pet. 426 (9 L. Ed. 773, 938); *Syracuse Water Co. v. City of Syracuse*, 116 N. Y. 167 (22 N. E. 381, 5 L. R. A. 546); *Long Island Water Supply Co. v. Brooklyn*, 166 U. S. 685, 696 (17 Sup. Ct. 718, 41 L. Ed. 1165); *Stein v. Bienville Water Supply Co.*, 141 U. S. 67 (11 Sup. Ct. 892, 35 L. Ed. 622). From these principles and authorities it follows that the Eastmans were given no exclusive or perpetual right, and that the ordinance operated to grant them a license only, and left the city free at any time to revoke the privilege granted, or to put in its own waterworks, or to grant a franchise to another company. The most that the licensees could claim under it was that it legalized their use of the streets for supplying water, and gave them permission to occupy the same until such time as the city might see fit to terminate the privilege.'

And in *Omaha Electric Light Co. v. City of Omaha*, 179 Fed. 455, (102 C. C. A. 601,) the Circuit Court of Appeals of the Eighth Circuit announced practically the same doctrine. From the opinion of Adams, Judge, we quote:

Legislative grants of power to municipal corporations must be strictly construed, and cannot operate as a surrender

of legislative power, except so far as expressly delegated or is indispensably necessary to the exercise of some other power which has been expressly delegated. *Boise City Artesian Hot & Cold Water Co. v. Boise City*, 123 Fed. 232 (59 C. C. A. 236); *City of Detroit v. Detroit City Ry. Co.* (C. C.) 56 Fed. 867, 876; *Turnpike Co. v. Illinois*, 96 U. S. 63 (24 L. Ed. 651); *Long Island Water Supply Co. v. Brooklyn*, 166 U. S. 685, 696 (17 Sup. Ct. 718, 41 L. Ed. 1165); *Citizens' St. Railway v. Detroit Railway*, 171 U. S. 48 (18 Sup. Ct. 732, 43 L. Ed. 67); *Water, Light & Gas Co. v. City of Hutchinson*, 207 U. S. 385 (28 Sup. Ct. 135, 52 L. Ed. 257); *Lancaster County v. Green*, 54 Neb. 98 (74 N. W. 430).

Applying this rule to the present case, we are of opinion that the conference of power in general terms to 'provide for lighting the streets' or 'to care for and control the streets' is not specific enough to warrant a grant by the city to a business corporation of the right to use the streets of the city forever for the purpose of conducting a general lighting business. That is servitude not embraced within the ordinary control over streets usually given to municipalities. A perpetual franchise, even if not exclusive in fact, becomes largely so by the advantage in the race, which preoccupancy of the field and perpetual right to continue in it afford. And, while it may not be technically obnoxious to the constitutional prohibition against 'granting special privileges or immunities,' it is so unusual and extraordinary as to require, in our opinion, a more specific legislative authorization than the general language relied on by the company therefor. We therefore conclude that, even if the mayor and council had intended to grant a perpetual franchise to the company, they were powerless to do so.

This conclusion might put an end to further discussion; but another proposition was argued before us which brings us to the same result. The ordinance, when taken as a whole and construed in the light of what was expressed as well as unexpressed in it, and, in view of all the attending facts and circumstances, discloses, we think, a clear purpose not to grant a perpetual franchise. The right to use the streets of the city forever to inaugurate and promote a private enterprise would seem to have been so important and valuable a feature of the contract as to irresistibly lead the contracting

parties to mention it specifically, if they intended to provide for it, and not leave its existence dependent upon implication.

. . . The fact that the company was permitted, without let or hindrance, to continue its business for the full period of twenty years indicates a mutual understanding that some substantial term of enjoyment was contemplated.

In *Turnpike Co. v. Illinois, supra,* the Supreme Court of the United States, in considering whether the grant of a given franchise was in perpetuity or not, made use of the following language: 'No term was expressed for the enjoyment of this privilege, and no conditions were imposed for resuming or revoking it on the part of the state. It cannot be presumed that it was intended to be a perpetual grant, for the company itself had but a limited period of existence. At common law, a grant to a natural person, without words of inheritance, creates only an estate for the life of the grantee, for he can hold the property no longer than he himself exists. But, by analogy to this, a grant to a corporation aggregate, limited as to the duration of its existence, without words of perpetuity being annexed to the grant, would only create an estate for the life of the corporation. . . . Grants of franchises and special privileges are always to be construed most strongly against the donee, and in favor of the public.'

In *Wyandotte Electric Light Co. v. City of Wyandotte,* 124 Mich. 43 (82 N. W. 821), the Supreme Court of Michigan considered an application to restrain interference with poles and wires of an electric light company, and said: 'If a railroad company were organized for a period of 30 years, and a party, natural or corporate, should grant it a right of way without specifying the time of user, the grant would be for the lifetime of the corporation. The law would imply that both parties contracted with reference to its period of existence. The same rule is applicable here'—citing *Turnpike Co. v. Illinois supra.* . . .

To the same effect are *Blair v. Chicago,* 201 U. S. 400, 481 (26 Sup. Ct. 427, 50 L. Ed. 801); *City of Rock Island v. Central U. Tel. Co.,* 132 Ill. App. 248; *Virginia Cañon Toll Road Co. v. People,* 22 Colo. 329 (45 Pac. 398, 37 L. R. A. 711).

We think the facts of this case, in the light of the foregoing authorities, disclose the intention that the company

should have and enjoy the franchise in question at least for
the period of its corporate existence, and that its assigns or
successors might thereafter hold and enjoy the same at the
will of the city only.

This conclusion reconciles many, if not all, of the appar-
ent inconsistencies of the situation, and is not in disharmony
with the principle declared in *Detroit v. Detroit Citizens' St.
Ry. Co.,* 184 U. S. 368, 395 (22 Sup. Ct. 410, 46 L. Ed. 592),
and *State ex rel. City of St. Louis v. Laclede Gaslight Co.,*
102 Mo. 472 (14 S. W. 974, 15 S. W. 383, 22 Am. St. Rep.
789), that a corporation whose corporate existence was lim-
ited to a term of years could not accept a grant or make a
contract extending beyond the limit of its corporate life. The
question here is not whether a lawful contract could be made
for a term extending beyond the corporate life of the com-
pany, but relates to the probative force which limited life
tenure, among other facts and circumstances, has in con-
struing a contract of uncertain and ambiguous character like
that under consideration.

Again in *Logansport Ry. Co. v. City of Logansport,* (C.
C.) 114 Fed. 688, District Judge Baker used the following
language:

It is manifest from a reading of the above-mentioned
statutory provisions that the Legislature has not conferred,
in explicit and express words, on the city of Logansport the
power to grant to a street railway company either an exclu-
sive or a perpetual use of its streets for railway purposes.
The act of 1861 simply provides that the street railway com-
pany shall first obtain the consent of such common council to
the location, survey, and construction of its railroad, before
the construction of the same shall be commenced. No words
of perpetuity are expressly employed. The same is true of
the act of 1891. There being no express words of perpetuity
in the legislative grant, is such power necessarily to be implied
from the language employed? In *Detroit Citizens' St. R.
Co. v. Detroit Ry.,* 171 U. S. 48 (18 Sup. Ct. 732, 43 L. Ed.
67), the question for decision was whether the Legislature of
Michigan had conferred power on the city of Detroit to grant
to a street railway company the exclusive use of its streets.
The statute provided that: 'All companies or corporations

formed for such purposes [the railway purposes mentioned in the act] shall have exclusive right to use and operate any railways constructed owned or held by them: Provided that no company or corporation shall be authorized to construct a railway under this act through the streets of any town or city without the consent of the municipal authorities of such town or city, and under such regulations and upon such terms and conditions as said authorities may from time to time prescribe.'

The court says: 'It is clear that the statute did not explicitly and directly confer the power on the municipality to grant an exclusive privilege to occupy its streets for railway purposes.'

And so it must be held that similar and no broader language employed in the acts of 1861 and 1891, above mentioned, does not explicitly and directly confer the power on the common council of the city of Logansport to grant either an exclusive or a perpetual privilege to occupy its streets for railway purposes. The court further says: 'There were many reasons which urged to this; reasons which flow from the nature of the municipal trust, even from the nature of the legislative trust, and those which, without the clearest intention explicitly declared, insistently forbid that the future should be committed and bound by the conditions of the present time, and functions delegated for public purposes be paralyzed in their exercise by the existence of exclusive privileges.'

And how much stronger are the reasons which insistently forbid that the future should be committed and bound in perpetuity by the conditions of the present time, and that functions delegated for public purposes should be forever paralyzed in their exercise? That such powers must be given in language explicit and express, or necessarily to be implied from other powers, is now firmly established.

The power to grant the use of its streets in perpetuity not having been granted to the city of Logansport in explicit and express words, is it granted by a necessary implication? The Supreme Court, in the above cited case, further says: [Here follows the quotation hitherto made from *Detroit Co. v. Railway Co., supra.*]

But assuming that the power 'to give consent upon such terms and conditions as the common council may see fit,'

founded in the act of 1891, does acquire breadth from such expression, surely there is sufficient range for its exercise without extending it so as to embrace the power to grant the use of the streets in perpetuity.

The Supreme Court, further on, says: 'Easements in the public streets for a limited time are different, and have different consequences, from those given in perpetuity. Those reserved from monopoly are different, and have different consequences, from those fixed in monopoly. Consequently those given in perpetuity and in monopoly must have for their authority explicit permission, or, if inferred from other powers, it is not enough that the authority is convenient to them, but it must be indispensable to them.'

Can it be successfully contended that the perpetual use of the streets of a city is indispensable to their use for railway purposes? . . .

It was *ultra vires* of the common council to surrender its control of the streets of the city in perpetuity to the complainant. The municipal authority had no power to grant forever to the complainant the right, at its own uncontrolled election, to use and occupy such or all of the streets of the city as it might from time to time elect. The right to determine for itself from time to time, what streets could be used and occupied for street railway purposes, consistently with the public safety and welfare, is a power incapable of absolute alienation by the common council. . . .

By these ordinances, if valid, to the complainant's election is relegated the question whether or not a street can, with due regard to the comfort and safety of the people, be occupied by a single or a double track railway. Such a surrender of corporate power in perpetuity to a street railway company cannot and ought not to be upheld. It cannot be supported as a reasonable exercise of the power of a trustee over a trust estate committed to its charge, to be administered in the interests of the public, and not for the private advantage and gain of railway or other corporations.

In *Birmingham v. Street R. R. Co.*, 79 Ala. 465, (58 Am. Rep. 615), the Supreme Court of that state said:

Monopolies were void at the common law, and are not commonly conferred by legislative grant, and need no special

prohibition in the organic law of a free republic. They may now be regarded as relics of governmental folly, rendered odious by royal prerogative in the most extravagant periods of the European monarchies. In the strict sense, a monopoly is an exclusive right granted to one person, or a class of persons, of something which was before of common right. A franchise is a special privilege conferred by the state or government upon individuals, and which does not belong to citizens of the country by common right. It has been a common legislative practice to make grants of this kind, and they have led to much and protracted litigation in all of the American courts. . . .

The following cases illustrate monopolies of this kind so often conferred by legislative franchises: *New Orleans Gas Co. v. Louisiana Light Co.,* 115 U. S. 650 (6 Sup. Ct. 252, 29 L. Ed. 516) ; *New Orleans Water Works Co. v. Rivers,* 115 U. S. 674 (6 Sup. Ct. 273, 29 L. Ed. 525) ; *Binghamton Bridge,* 3 Wal. 51 (18 L. Ed. 137) ; *City of Chicago v. Rumpff,* 45 Ill. 90 (92 Am. Dec. 196) ; *Slaughter House Cases,* 16 Wall. 36 (21 L. Ed. 394) ; *Gale v. Kalamazoo,* 23 Mich. 344 (9 Am. Rep. 80) ; *Atlantic City Waterworks v. Atlantic,* 39 N. J. Eq. 367 (10 Am. & Eng. Corp. Cases, 59) ; *Norwich Gaslight Co. v. Norwich City Gas Co.,* 25 Conn. 19; *Mobile R. Co. v. Kennerly,* 74 Ala. 566; *Daughdrill v. Alabama Life Ins. Co.,* 31 Ala. 91; *Home of the Friendless v. Rouse,* 8 Wall. 430 (19 L. Ed. 495). The very fact that the Legislature could, according to the better view, make irrevocable grants of this nature was the very reason, no doubt, why the organic law was made so as to prohibit such grants in the future. In the struggling infancy of states and communities, the temptation has been very great to offer them as a reward to the investment of capital. The injustice and inequality of their operation have only been illustrated in the light of the rapid increase of our population, the steady growth of our wealth, and the wonderful discoveries of modern science. It now more fully becomes manifest that they prove iron bands to fetter the growth of public industry, enterprise, and commerce. Free competition in all departments of commercial traffic is justly deemed to be the life of a people's prosperity. The policy of the law, as now declared by our Constitution, is as clear in the condemnation of the grant of irrevocable exclusive privileges conferred by franchise as that of the

common law was in the reprobation of pure monopolies, which were always deemed odious, not only as being in contravention of common right, but as founded in the destruction of trade by the extinguishment of a free and healthy competition. *Cases of Monopolies*, 11 Rep. 84.

In *Des Moines St. R. R. v. Des Moines Broad Gauge Street R. R. Co.*, 73 Iowa, 517, we said:

In our opinion, however, the meaning of the provision [of the ordinance] is the same as if it read, 'The right herein granted to said company to operate said railway shall be exclusive' of other street railways. It was not necessary to provide by ordinance that other persons should not run cars on the plaintiff's assignor's track, nor obstruct its cars; and no one, we think, looking at the ordinance, can suppose that that was all that was intended. So far, the plaintiff's assignor's right would be exclusive by reason of the mere right of property, and without any ordinance. If anything more were necessary, we find it in the very section of the ordinance under consideration. It is provided in the same section, and same sentence, as follows: 'And the said city of Des Moines shall not, until the expiration of said term, grant to or confer upon any person or corporation any privileges which will impair or destroy the rights and privileges herein granted to said company.' The right granted was to lay and operate a track on all the streets of the city. The construction and operation of a rival railway would impair the plaintiff's right. It might not constitute a physical interference; but it would impair, if not destroy, the plaintiff's enterprise, so far as the profits were concerned, and those, we may assume, constituted the sole object of the enterprise. We cannot think that there is any reasonable doubt about the meaning of the ordinance. We think that the city undertook to exclude rival companies which would interfere with the profits of the company for whose benefit the provision was intended. . . '.

The question presented is as to whether there is any way in which cities can contract against themselves so as to furnish any security that the losses of the early years may be repaired by the profits of the later ones. The defendant company contends that there is not. Its position is that it

would be unsafe to allow a city to contract even for a limited time, because it cannot anticipate its own wants, and the power, if given, would be improperly exercised. Its argument is that city councils, as a rule, have neither sufficient honesty nor foresight. It cites and quotes largely from an opinion of Judge Brewer in *Jackson County Horse Ry. Co. v. Rapid Transit Co.* (C. C.) 24 Fed. 306. In that case the learned judge said: 'The city may to-day determine that one street railroad will answer all the wants of the public, and so give the privilege of occupying the streets to a single company. Ten years hence its judgment may be that two railroads are needed.'

It may be conceded that the future growth and wants of a city cannot be foreseen. The most that can be said is that they may ordinarily be predicted with reasonable approximation for a limited time. From this we are inclined to think it follows that an ordinance providing for an exclusive right in perpetuity, however necessary it might be to contract for the service involved in the exercise of the right would be unreasonable, and might be declared void. In Dill, Mun. Corp. section 715, the author, commenting upon *Davis v. Mayor of New York*, 14 N. Y. 506 (67 Am. Dec. 186), says: 'The judgment of the court rests upon the sound principle that the powers of a corporation, in respect to the control of its streets, are held in trust for the public benefit, and cannot be surrendered or delegated by contract to private parties; and hence the resolution of the city council, authorizing private persons to construct and operate a railroad upon certain terms, without power of revocation, and without limit as to time, was not a license or act of legislation, but a contract, void, however, because, if valid, it would deprive the corporation of the control and regulation of its streets.'

In the case at bar, the time limit was 30 years, which does not seem to be unreasonable, and especially in view of the fact that the lines were operated at loss for 14 years. . . .

. . . The ordinance appears to us to be reasonable; and our holding is that, under our statute, which empowers cities to authorize or forbid the laying down of a street railroad track, a city council may make reasonable provision by contract for present and future street railroad service, and may secure the company contracted with against the impair-

ment of its profits for a limited time, and against interference with its extension during the time, if a larger and better or more immediate service can be thus obtained. This question has never before been determined by this court; but the ruling in *Burlington & Henderson County Ferry Co. v. Davis*, 48 Iowa, 133 (30 Am. Rep. 390), goes far toward supporting the views which we have expressed.

As already intimated, the only dissent from these views, if there be any, is found in *People v. O'Brien supra*, also reported in 7 Am. St. Rep. 684. Counsel for the street railway company rely not only upon this case, but also upon *Louisville v. Tel. & Tel. Co.*, 224 U. S. 649, (32 Sup. Ct. 572, 56 L. Ed. 934), and without citing them upon the charters granted in most of the New England states, which were in perpetuity. With reference to the case last cited, it should be observed that the franchise therein considered was granted by the Legislature itself, and that no point was made regarding its constitutionality. The following quotation from the opinion will sufficiently indicate the grounds upon which the decision was based:

The appellant makes the further contention that its general demurrer should have been sustained and the bill dismissed because the original grant of street rights, having been indefinite as to time, was either void *ab initio* or revocable at will of the general council, or that it expired in 1893, when (Ky. Stat. Section 2742) Louisville was made a city of the first class, with new and enlarged powers. In support of this proposition, numerous decisions are cited, in some of which it appeared that a state had chartered a public utility corporation, but the city, by ordinance, had given an exclusive or perpetual grant of a street franchise which was held to be void because made in excess of the statutory power possessed by the municipality. In others it was decided that such privileges terminated with the corporate existence of the municipality, through whose streets the rails and tracks were to be laid. *Detroit Citizens' Street R. Co. v. Detroit R. Co.*, 171 U. S. 48, 54 (18 Sup. Ct. 732, 43 L. Ed. 67, 71); *St. Clair County Turnp. Co. v. Illinois*, 96 U. S. 63 (24 L.

Ed. 651); *Blair v. Chicago,* 201 U. S. 400 (26 Sup. Ct. 427, 50 L. Ed. 801); 3 Dill. Mun. Corp. Sections 1265-1269.

None of these decisions are applicable to a case like the present, where the Ohio Valley Telephone Company, with a perpetual charter, has received, not from the municipality, but from the state of Kentucky, the grant of an assignable right to use the streets of the city which remains the same legal entity, although by a later statute it has been put in the first class and given greater municipal powers. *Vilas v. Manila,* 220 U. S. 345, 361 (31 Sup. Ct. 416, 55 L. Ed. 491, 497).

In considering the duration of such a franchise, it is necessary to consider that a telephone system cannot be operated without the use of poles, conduits, wires, and fixtures. These structures are permanent in their nature, and require a large investment for their erection and construction. To say that the right to maintain these appliances was only a license, which could be revoked at will, would operate to nullify the charter itself, and thus defeat the state's purpose to secure a telephone system for public use. For manifestly no one would have been willing to incur the heavy expense of installing these necessary and costly fixtures if they were removable at will of the city, and the utility and value of the entire plant be thereby destroyed. Such a construction of the charter cannot be supported, either from a practical or technical standpoint.

This grant was not made at will, nor for years, nor for the life of the city. Neither was it made terminable upon the happening of a future event; but it was a necessary and integral part of the other franchises conferred upon the company, all of which were perpetual, and none of which could be exercised without this essential right to use the streets. The duration of the public business in which these permanent structures were to be used the express provision that franchises could be mortgaged and sold, the nature of the grant, and the terms of the charter as a whole, compel a holding that the state of Kentucky conferred upon the Ohio Valley Telephone Company the right to use the streets to the extent and for the period necessary to enable the company to perform the perpetual obligation to maintain and conduct a telephone system in the city of Louisville. Such has been the uniform holding of courts construing similar grants to

like corporations.  *Milhau v. Sharp* (1863) 27 N. Y. 611 (84 Am. Dec. 314) ; *State, Hudson Tel. Co., Prosecutor, v. Jersey City*, 49 N. J. Law, 303 (8 Atl. 123, 60 Am. Rep. 619) ; *Mobile v. Louisville & N. R. Co.*, 84 Ala. 122, (4 South. 106, 5 Am. St. Rep. 342) ; *Seattle v. Columbia & P. S. R. Co.*, 6 Wash. 392 (33 Pac. 1048) ; *People ex rel. Woodhaven Gaslight Co. v. Deehan*, 153 N. Y. 528 (47 N. E. 787).  The earlier cases are reviewed in *Detroit Citizens' Street R. Co. v. Detroit,* 26 L. R. A. 667 (12 C. C. A. 365, 22 U. S. App. 570, 64 Fed. 634), which was cited with approval in *Detroit v. Detroit Citizens' Street R. Co.*, 184 U. S. 395 (22 Sup. Ct. 421, 46 L. Ed. 610), this court there saying that: 'Where the grant to a corporation of a franchise to construct and operate its road is not, by its terms, limited and revocable, the grant is in fee.'

Under this theory, the rule with most of the Legislatures in the Eastern states was to grant perpetual street railway franchises.  See Wilcox's Municipal Franchises, vol. 2, section 348 et. seq.  Such was the rule, until recently, in New York, and doubtless in Maine, Connecticut, Pennsylvania, Rhode Island, and Delaware, and until recently in New Jersey.  And as a result we have the inadequate surface car lines on Broadway in New York, and several cross-town, and at least one main line near the ferries, operated by animal power.  The situation in Philadelphia and other Pennsylvania cities has become almost intolerable, and the former city has practically surrendered all control to the street railway companies.  In some of the states, as in Massachusetts and Wisconsin and in the District of Columbia, what are called indeterminate franchises are provided for.  See McQuillan on Municipal Corporations, section 1656, and Wilcox on Franchises, section 44.  According to report, this is the form of franchise under which the street railways of Chicago and Indianapolis are now being operated.  By many writers on municipal affairs, they are regarded with favor. With more prescience and judgment, most of the Southern, Western and Pacific states have provided for limited franchises, and have provided in their

Constitutions that no perpetual franchises shall be granted. Even in New Jersey it is now provided, as we understand it, that franchises shall not be granted for a period exceeding thirty-three years, except on referendum to the people, and then only for sixty-six. At least this was the report of the committee. See Report of Commission, published by state in 1906. In Illinois the maximum period is twenty years; in Ohio, twenty-five years; in Michigan, thirty. Without going more deeply into the subject, it is enough to say that as a rule perpetual franchises are no longer granted by the Legislatures of states having authority to do so, and that they are everywhere regarded as inimical to the public welfare. The better opinion now is that franchises should be indeterminate with adequate reserved power of control and regulation for short limited periods. We here quote from a distinguished author upon this subject (Wilcox on Franchises, vol. 2, section 292):

One of the most important conditions attaching to any franchise is the period for which it is to run. During the years when neglect of the public interests in franchise negotiations was more the rule than the exception, a great many cities granted perpetual franchises. This policy has now been discontinued in most states and cities. There are few students of public utility questions, outside of those who may have a direct financial interest in the companies, who would now claim that perpetual franchises for the use of the streets are in accordance with enlightened principles of government. In fact, it is almost unthinkable to a citizen of the twentieth century that special privileges in the streets of the city granted now or in the past should last forever. Even where franchises do not expire by limitation and are not revocable, the right of the state to acquire them by condemnation proceedings is coming to be generally recognized. It is quite abhorrent to a sense of public justice that a franchise once granted as a free gift should not be subject to resumption without the payment of great sums of money on account of the termination of the franchise right. But it is not necessary to discuss at length the merits of perpetual

franchises.    They lie outside the pale of reasonable controversy.

Instead of perpetual franchises, we may have either limited grants or indeterminate grants.    Many of the states have established a maximum period for which local franchises may be granted, ranging, usually, from twenty to fifty years.    The short term franchise has been extremely popular with those who feel a concern for the public interests. There are, however, a number of serious disadvantages in the short term franchise as usually granted.    In the first place, a street railway, like any other important public utility, should have a continuous and symmetrical development to satisfy the public need.    There is absolutely no reason why we should expect street railway service to stop at the end of a fixed period of fifteen, twenty-five or fifty years. There is every reason to expect that a utility designed to satisfy a permanent and ever-pressing public need, especially when the utility has survived all sorts of changes and become more and more firmly embedded in the general plan of urban life during more than half a century, will continue as a public necessity for an indefinite period.    While it is conceivable that some new invention of the genius of man may at some future time make the street railway in its present form unnecessary, there is no reason to expect such an event at the end of a definite period of years that can now be fixed. Changes in the arts will undoubtedly make revolutions in the street railway business in the future as they have in the past; but, after all, the demand for transit facilities is as permanent as the very existence of cities.    A street railway system, therefore, should be constructed, maintained, and operated with the expectation of permanent service.    The short term franchise, without any recognition of the fact that the street railway property will continue to be operated passed the end of the term, has had bad results.    Under such a franchise, in the nature of the case, a company can hardly be induced to construct extensions into unprofitable territory depending upon the development of future traffic for its reward.    When the term of a franchise comes within ten or fifteen years of expiration, all growth is likely to cease. Not only that, but improvements in motive power and equipment are likely to cease, and deterioration in the property is usually permitted.    Indeed, in extreme cases where a com-

pany accepts in good faith the limitation of its franchise term, without the hope of being able to recover its investment at the expiration of its grant, it inevitably follows that the road will be operated from the standpoint of squeezing out of it the maximum revenue and putting into it the minimum for operating expenses and maintenance.    Moreover, from the public standpoint, the limited term franchise usually results in bringing the street railway question forward as a disturbing political issue at regular intervals, or, what is worse, in tempting the company to keep in politics all the time in order that it may get an extension of its rights long in advance of the period of their expiration.    The evils of the short term franchise, without adequate provisions for continuity in the development or operation of the street railway system, are almost as patent as the evils of perpetual grants, although of quite a different character.

In Massachusetts and the District of Columbia, street railway franchises have been granted subject to revocation at any time.    This form of grant is called the indeterminate franchise.    When no provision is made, however, for purchasing the physical property in case of revocation, the indeterminate franchise becomes in effect practically perpetual. This is for the reason that neither the judiciary, nor the Legislature, nor the city council, nor the people at large will permit the destruction by the mere revocation of a permit of large bodies of capital invested in a necessary public service.    This form of the indeterminate franchise has been called 'tenure during good behavior.'    But the penalty of forfeiture without compensation is so drastic that behavior has to become very bad indeed before any community will punish it.    It appears to be true, however, that, even though, under this form of the indeterminate franchise, no street railway grants are in practice revoked except for specific locations where street railways are no longer desired, the companies have been more diligent to respond to the demands of the public for improved service and for extensions of their lines than under either perpetual or limited term franchises.

If we put together the principle that a public utility should be continuously and symmetrically developed to meet the needs of a growing community, and the other principle that the street railway is a public business in which capital should be guaranteed a limited risk and should be satisfied

with a limited profit, we may arrive at the right theory of franchises, so far as the question of duration is concerned. The city cannot properly fulfill its function unless it maintains a continuous control over the several uses of the street. It must have the power at any time to change or improve any public street, and to readjust the locations and the relations of the public utility fixtures on, above, or below the surface of the street. Moreover, inasmuch as the street railway business is a public function, the city must remain in a position whereby, in the event that this function is not being adequately performed, it can either resume it or transfer it to another agent. For these reasons it is an essential feature of a good street railway franchise that the city should have the right to terminate it at any time or at certain short term intervals upon giving not more than one year's notice. On the other hand, the protection of the investors, who have furnished the money to construct the plant necessary for the performance of this public function, requires that, in case a company's franchise is terminated, the property should be purchased by the city or by its licensee. Under such a provision, it will be safe for investors at any time to supply the capital for the construction, extension, and improvement of a street railway system, as they will know that whatever construction expenditures are made in good faith and with good sense will be returned to them if they are not permitted to continue the operation of the system indefinitely.

Every street railway franchise, therefore, should be indeterminate, with the proviso that a shifting of tracks, or even a substitution of routes more advantageous to the public, may be required at any time at the expense of the company; but, that if the franchise is revoked, the entire physical property shall be purchased either by the city or by another company authorized by the city to take it over and operate it.

This discussion is doubtless somewhat aside from the real issues in the case. It is justified, if at all, by the argument made at bar to the effect that a perpetual franchise is not inimical to public policy because of the power reserved to people under the articles of the Constitution, before quoted, to regulate and control all corporations through a public utilities commission or otherwise. The efficiency of such a com-

mission in the management of public utilities, is conceded, and doubtless such a law might well be enacted; but, were we now to announce that the franchise in this case is perpetual and a public utilities commission were created, much trouble would arise over any rules or orders that the commission might make regarding the conduct of the defendant street railway, for the reason that we are justified in assuming it will claim its franchise is a contract, which cannot be modified, even by the state itself, much less by a commission or a city government. It would undoubtedly cite, in support of such contention, 73 Iowa, from which we have heretofore quoted, and *Des Moines v. Water Works Co.*, 95 Iowa, 348, as well as many other cases tending in that direction.

The result of this discussion is to hold that the city council of the city of Des Moines had no power at any time to grant a perpetual franchise or a franchise in perpetuity, and that if it had attempted to do so, even in the broadest terms its act in so doing would have been *ultra vires* and void. Such being the case, it could not do indirectly what it was forbidden to do directly; hence defendant's evidence as to practical construction or estoppel will not aid in its claim to a perpetual franchise. This proposition is too fundamental to require the citation of authorities, and we leave it as too axiomatic to require further discussion.

III. The trial court intimated that, if he were bound to make a finding upon the subject, the holding would be that the franchise expired with the corporate life of the defendant railway company, or rather of the original

8. SAME: street railways: duration of franchise: construction.

company, to which the franchise was granted, which would be fifty years from October 1, 1866, or October 1, 1916. There are some cases which lend support to this view. See *Omaha Co. v. Omaha*, 179 Fed. 455, (102 C. C. A. 601); *St. Clair Co. v. Illinois*, 96 U. S. 63, (24 L. Ed. 651); *People v. Central Union Tel. Co.*, 232 Ill. 260, (83 N. E. 829); *Wyandotte Co. v. Wyandotte*, 124 Mich. 43, (82 N. W. 821). Some of these proceed upon the theory that, when the grant does not fix

the term and is not to "successors or assigns," the presumption obtains that it is for the corporate life of the grantee only; and others upon the theory that no time being fixed, even if the grant be to the grantee and successors, the presumed intent of the parties will be that it was for the life of the original grantee, subject, however, to the right of the parties to show that some other term, within the power of the municipality to grant, was in the mind of the parties. We shall not quote from these authorities, as they are readily accessible. One case holds that, where a franchise is unlimited as to time, it exists either for a reasonable time or is indeterminate in character. *Barre v. Perry,* 82 Vt. 301, (73 Atl. 574).

If, however, the grant is to successors or assigns, it does not terminate with the life of the corporation to which it is granted, but may be for a term beyond the corporate life of the original grantee. *State ex rel. v. Gaslight Co.,* 102 Mo. 472, (14 S. W. 974, 22 Am. St. Rep. 789); *Minneapolis v. Minneapolis Co.,* 215 U. S. 417, (30 Sup. Ct. 118, 54 L. Ed. 259); *Detroit v. Street Ry.,* 184 U. S. 368, (22 Sup. Ct. 410, 46 L. Ed. 592).

The defendant street railway company claims that the grant was expressly in perpetuity, or at least unlimited as to time, and that, if the latter, it was in perpetuity, and it assumes the middle ground that it was for the corporate life of the original grantee only as a matter of safety. It does not contend, however, that as the grant was to the original company, its successors or assigns, it is not limited to the life of the original grantee, but passed in perpetuity to its successors in interest.

We are united in the conclusion that the grant was not in perpetuity, and are also of opinion that it was not for the life of the original grantee. It was either exclusive for the limited period of thirty years, or else ambiguous and subject to explanation by parol testimony. If the latter, it could not, as we have seen, be made perpetual either by court decision, acts of the parties, or by estoppel. As already indi-

cated, some of the members of the court believe it was limited to the period of thirty years, and that it expired January 1, 1898. Others are of opinion that, whether it expired by its terms or not on January 1, 1898, the conduct of the city has been such that neither it nor the state can insist upon an immediate ouster. What was done prior to January 1, 1898, is immaterial to this controversy. But the conduct of the parties since that time may be considered in determining whether there should be an immediate ouster.

We may here remark, parenthetically, that the doctrine of laches does not apply, save as it may be considered in determining the final order which should be made. That question is settled in the *Cedar Rapids Water Co.* case, 118 Iowa, 254 et seq. We shall not do more than cite that precedent in support of the doctrine here announced. Again, upon the question of practical construction since January 1, 1898, it is well to note that by the Code of 1897, sections 775, 776, it is provided that: "Cities and towns shall have the power to authorize and regulate telegraph, district telegraph, telephone, street railway and other electric wires and poles and other supports thereof. . . . No franchise shall be granted, renewed or extended by any city or town for the use of its streets, highways, avenues, alleys or public places, for any of the purposes named in the preceding section unless a majority of the legal electors voting thereon vote in favor of the same at a general or special election." These provisions would seem to be an express limitation upon the power of city councils, of which the street railway company was bound to take notice.

9. SAME: termination of franchise: ouster: laches.

As to practical construction, it is to be noted that the defendant company, as successor in interest to the rights of the original grantee, has not, since the year 1898, complied with terms of the original ordinance on its part. It has not paid taxes thereunder, and in other respects has failed to observe or perform the obligations of that ordinance on its part. Moreover,

10. SAME: franchise: practical construction.

in the year 1895, the city council passed an ordinance giving the defendant company a right to carry the United States mail, express, and freight, and material for the construction of its road, and further provided that: ''Nothing in this ordinance contained shall be construed as to extend the charter of the companies operated by the Des Moines City Railway beyond the time fixed in their original charter, and if the charters of any of the said companies expire before eight years, then all rights granted by this ordinance shall also expire at the same time.''

The street railway was at that time claiming to operate under many charters granted to different companies and by many municipalities, which have since been merged into ''Greater Des Moines.'' This was a clear indication on the part of the city that it did not recognize any of the charters as perpetual; and we may here remark that the ordinances granted by the small independent municipalities were many of them without words of succession; and, under the holding of the Supreme Court of the United States, these became extinct after the towns were merged into the city of Des Moines proper. *Blair v. Chicago*, 201 U. S. 400-487, (26 Sup. Ct. 427, 50 L. Ed. 801); *People v. Telephone Co.*, 220 Ill. 238, (77 N. E. 245). In passing this ordinance of 1895, the city council clearly indicated that it understood all the franchises were limited; and, as we understand it, this original franchise of the year 1866, was the only one, which could expire within the eight-year period mentioned in the ordinance of the year 1895.

Reduced to its last analysis, the claim of the street railway company is that it has complied with many of the orders of the city council since the year 1898, although it admits it has not complied with all the terms of the original franchise ordinance of the year 1866. In other words, it has observed such conditions of the original franchise ordinance and such subsequent orders of the city council as it saw fit to recognize; and it is claimed that this constitutes a practical construc-

tion, binding upon the city, although, since the expiration of the thirty-year period, the city council has had no authority to extend the franchise, except upon a referendum vote. Manifestly there is no merit in the board claim made for the company. Furthermore, the defendant company was the assignee of many franchises; and, as there was nothing in its conduct which indicated that in what it did it was claiming to act under the original ordinance of 1866, no estoppel would arise. Again it has been held by this court that, even if both parties act upon the assumption that a franchise has not expired, this will not operate to extend or enlarge the franchise. *Cedar Rapids Co. v. Cedar Rapids,* 118 Iowa, 234; See, also, to same effect, *Grand Rapids Co. v. Prange,* 35 Mich. 400, (24 Am. Rep. 585); *Cincinnati Co. v. City of Cincinnati,* 52 Ohio St. 609, (44 N. E. 327); *Tri-State Telephone & Telegraph Co. v. City* (C. C.) 183 Fed. 854; *Seeger v. Mueller,* 133 Ill. 86, (24 N. E. 513); *State v. Minnesota Trf. Co.,* 80 Minn. 108, (83 N. W. 32, 50 L. R. A. 656); *Wormstead v. Lynn,* 184 Mass. 425, (68 N. E. 841).

However, it does appear that the city has, since the year 1898, made many demands upon the street railway company, to which it has acceded; and it has upon orders of the city paid for paving and for reconstruction of its tracks, and in other ways incurred expense upon the theory that, in virtue of some ordinance, it was entitled to operate its cars upon the streets of the city; in other words, that it is not a trespasser. Some of these things have been done since this action was commenced, and since the street railway knew that its rights upon the streets were being questioned. This action, as will be noticed, was commenced in the year 1905, seven years after the ordinance is claimed to have expired, and about the same length of time before the case came here for final determination. Since the year 1905, the street railway company might well have objected to making any further improvements, because of the attitude of the state and the city. But some have

11. SAME: ouster: reasonable time for removal.

been made, and the final question is, What shall be done with the case? Our final conclusion is that the franchise has expired, or at least has been indeterminate since the year 1898, but that it would be wrong and inequitable to grant an order for immediate ouster. On the other hand, present conditions are intolerable, and such an order should be made as will approximate equity even in a quo warranto proceeding. We think the street railway company should have a reasonable time to negotiate an extension or renewal of its franchise, or, if this cannot be done, that it have the same length of time to dispose of its property to some one who will consent to operate under such reasonable franchise as the voters of the city of Des Moines may see fit to grant, or to dispose of its property to the city itself, should it elect to purchase, or, failing in all this, that it have the right to remove its plant, without let or hindrance, subject to any rights, if any, it may have against the city of any of the property owners growing out of its payments for paving, etc. As some or all of these proceedings may involve a referendum vote, and perhaps two submissions to the people at general or special elections, and much detailed work, we are constrained to grant the railway company the full period of two years from and after the filing of this opinion within which to make compliance herewith.

It follows that the trial court was in error in holding that the street railway franchise had not expired, and its judgment must be and it is reversed. It is our duty, as we view it, to enter such judgment as the trial court should have entered; and, as each party moved for a directed verdict, we believe we have full power in the premises to direct what the final order should be. The case will therefore be reversed and remanded, or, at plaintiff's option, a final judgment will be entered in this court. We have not passed upon every question presented, and might, perhaps, have profitably discussed some other matters. But this opinion has already exceeded reasonable bounds, and we conclude by saying that we have no reason to fear that the people of the city of Des

Moines will attempt to deal unfairly with the company. It seems, in view of the past history of this controversy, that it is time for some tolerance on both sides. A street railway is absolutely essential to the future growth and development of a city. It is as vital to it as the circulatory system to the human body; and to be deprived of it would practically mean death. On the other hand, a street railway has a social profit which cannot be entirely overlooked. Every increase in population, by reason of birth or removal to a city, has added to the valuation of its property. Defendant's franchise, were it existent today and in perpetuity, would be worth large sums of money. Doubtless the original promotors conducted the business at a loss for a certain length of time, and may never have profited a cent therefrom; and they or their successors may be entitled to great consideration on this account. Regard, too, must be had of the fact that, with the growth of the city, the street railway company must necessarily be put to large expense in the way of making extensions and improvements in its plant, and must often go into localities which are not now populated at all, or, if at all, very meagerly; and by these extensions it builds up and adds value to the property of every citizen. In the final adjustment of matters, we have no doubt that all of these, as well as many other considerations, will be taken into account; and we grant the time indicated in order that there may be a period for sober reflection, and in the end sound judgment exercised.

The judgment must, however, be *Reversed.*