STATE OF IOWA, Appellee, v. OTTUMWA RAILWAY & LIGHT COMPANY, Appellant.

**STREET RAILWAYS: Franchise—Construction.** The following principles for the construction of franchise provisions are recognized:

1. Franchises are to be strictly construed, and, where ambiguous, are to be construed against the grantee and in favor of the public.

2. Conditions existing at the time, and to which the franchise was to apply, are appropriate for consideration.

3. The grantee's own interpretation of the franchise and the public acquiescence therein are entitled to consideration.

4. If the words convey a definite meaning, and involve no absurdity or contradiction, then such meaning must be accepted.

A provision that cars shall, *"in each and every direction, run"* at certain intervals of time, is, in view of these principles, and on the record submitted, held to mean that the company shall run their cars *"both ways on the several lines"* of the system at said intervals of time and not one way on one line and the reverse way on another and near-by line.

**MANDAMUS: Jurisdiction—Granting of Writ—Discretion.** A writ of mandamus is not always demandable *as an absolute right*, even to compel a public service corporation to comply with and fulfill its franchise obligations. A material consideration is whether the writ will or will not promote substantial justice. Record reviewed, and held to reveal no abuse of discretion in the trial court in issuing the writ commanding a street railway company to run its cars each way on each line at stated intervals, as required by the franchise.

**MANDAMUS: Subject and Purposes of Relief—Compelling Compliance with Franchise.** Principle recognized that a railway company may be compelled by writ of mandamus to perform its franchise obligations.

*Appeal from Wapello District Court.—C. W. VERMILION, Judge.*

FRIDAY, DECEMBER 16, 1916.

ACTION in mandamus to compel compliance with the terms of a franchise granted to defendant. Decree was entered as prayed. The defendant appeals.—*Affirmed.*

*McNett & McNett,* for appellant.

*E. K. Daugherty* and *Jaques & Jaques,* for appellee.

LADD, J.—I. A franchise was granted by the city of Ottumwa, in 1901, to the company to which defendant is successor, "to acquire, construct, maintain and operate by

1. STREET RAIL-
WAYS: fran-
chise: construc-
tion.

electric or other motive power acceptable to the city, other than steam power, upon and over streets, alleys, and the Market Street bridge, and such other bridge or bridges as the council may in the future designate of the city of Ottumwa, *a system of street railways to include its present lines, for the transportation of passengers, baggage, mail, express packages, produce, freight,* etc., over and upon all of said lines, for a period of 25 years." Nearly all the lines had been laid then, and were in operation. A track extended along Second Street from Forest Avenue in a southeasterly direction to its intersection with Market Street, a distance of something over two miles. A track connecting with the Second Street line, near the Chicago, Milwaukee & St. Paul Railway Company's track, a trifle more than a mile east of Forest Avenue, was laid in 1906, along Main Street to Market Street, and a line previously constructed extended in an easterly direction to Vernon Street, a distance of about two and one-half miles. The Court Street line runs in a northerly, and the Jefferson Street line in a northeasterly, direction from the Second Street line at Market Street. The Church Street line is oper-

ated from the same point, over the Market Street bridge along Church Street in a southwesterly direction. From this line, the Ward Street line branches south, as also does the Sheridan Avenue line, from which the Wabash Avenue line branches. The Chester Street line extends westerly from the intersection of Church Street and Ward Avenue. The starting point for all cars is a loop formed by the Main and Second Street lines between Market Street and Green Street (Green being the next street east of Market), and tracks between these on Green, and double track on Market Street. There are 13.55 miles of track. For many years, cars departed from Market Street out on the several lines, and returned around the loop by going south on Market Street or east on Main Street, and on around to another trip. The several lines are connected only as stated. Until October 20, 1914, cars were operated both ways on Second Street and every other line of the city, except that on Main Street, but never regularly both ways on that street. In that month, defendant ceased running cars in an easterly direction on Second Street between Market Street and the Chicago, Milwaukee & St. Paul Railway crossing, a distance of one mile, and since then has not operated cars on Main Street in a westerly direction between the points mentioned. The object of this action is "to require defendant to run its cars in each direction on Second Street and on Main Street in the city of Ottumwa, Iowa, at intervals not greater than 20 minutes, up to 10 o'clock P. M., and at least every 30 minutes from then on while the cars are being run." As all the lines are conceded to be operated under the franchise, it is unnecessary to set out the history of the development of the enterprise. Prior to October 20, 1914, two cars started at the intersection of Market and Second Streets, went south on Market Street to Main Street, then along it west, past its junction with Second Street on to Forest Avenue, the end of the line, and returned over Second Street to the starting point. The schedule of these cars was 15 minutes each way. Another car, known as

the loop or shuttle car, was operated both ways on Second
Street from Market Street to its junction with the Main
Street track every 15 minutes. It will be observed that cars
ran only one way on Main Street, and on Second Street, two
cars easterly only, and the third, both ways. The change
made October 20, 1914, was this: The loop or shuttle car,
which had plied both ways, was taken off, and the two cars
mentioned, with three cars theretofore operated on the east
end of Main Street, between Market and Vernon Streets,
were run westerly on Second Street to the end of the line on
Forest Avenue, and back to the junction with the Main
Street line, where they passed over to Main Street and on
east to Vernon Street, and then back to Market Street, where
they proceeded on Second Street as before, making a 10-minute
schedule part of the day, and a 15-minute schedule during
the remainder thereof. These cars, though operated both
ways from the junction of the lines west to Forest Avenue,
and from Market Street to Vernon Street, run one way only
on Main and Second Streets between said junction of the
lines and Market Street. Was this in violation of the por-
tion of Section 9 of Ordinance No. 603, passed by the city
council, ratified and approved by the people, and accepted
by the defendant, and under which the street railway system
is being operated? In so far as material, that section reads:

"This franchise is granted, and the rights and privileges
herein conferred are subject to the following conditions, and
the cars of said company shall be run upon and along the
tracks of said company in conformity with the following
rules, to wit: . . . Cars shall start from all proper starting
points as early as 6 o'clock A. M., and run continuously as
late as to 11 o'clock P. M., or until 12 P. M. if necessary.
The council reserving the right to require the company to
run until 12 P. M. at such times as it may designate by
resolutions or ordinances. At all times during the day or
night while cars are running, they shall, in each and every
direction, run at intervals of not more than 20 minutes up

·to 10 o'clock P. M., after which, at least every 30 minutes
in each and every direction, the last car to leave the central
station on its outward trip as late as 11 o'clock P. M."

With reference thereto, counsel for appellant argued that
this means that "the cars should make the round trip in
each direction in the city traversed by the street car system
at intervals of not more than 20 minutes;" that wherever
defendant "projected a line, or close parallel lines, there
should be one round trip at least every 20 minutes in the
direction of such line or close parallel line." The argument
seems to be that "each and every direction" has reference to
geographical directions, or the points of the compass; and
if cars go out in one general direction, as in a northerly
direction, and they or others return from the northerly part
of the city, this should be construed as operating the cars
as exacted by the ordinance, assuming the lines to be connected
by a loop, and only a few blocks apart. They say that, at
the time the franchise was granted, it must have been per-
fectly obvious to all parties connected therewith, "and to
the public in voting the same, that, if any car went out upon
that line, *it would either have to come back upon the same
line, or remain out.* In that case, there would have been
no necessity for the use of the expression, 'in each and every
direction,' since it could hardly have been assumed by any-
one that the company would run a car out to the end of its
line and leave it there. Hence some other meaning must have
been intended to be conveyed by the expression, 'each and
every *direction,*' as the same occurs in the ordinance."

Suppose the words be omitted, as proposed, might not
the company comply with the terms of the franchise by oper-
ating only in one direction? Again, if there were a loop to
another track, a round trip every 40 minutes would comply
with the part of the ordinance quoted, without the clause
proposed to be omitted; and, even if not omitted, under
counsel's argument this would be so, regardless of how far
the lines were apart, if extending in the same general direc-

tion. As suggested, the design of the ordinance granting the franchise was to establish a street car system by laying tracks "upon and over streets, alleys and bridges;" and necessarily the projection of new lines or the extension of old lines depended on the growth and development of the localities, and somewhat on the topography of the city; but this does not necessarily mean that lines nearly parallel and with loops shall be constructed. The more natural inference would be that the methods then in vogue would be followed, and that these were in mind in granting and accepting the franchise. The lines were not then connected by loops, and none have since been so connected other than those in question, nor does it appear that any such connection is now in contemplation. Conditions existing at the time, and to which the franchise was to apply, are appropriate for consideration in interpreting its meaning. Moreover, the company operated cars in both directions on all its lines up to 1906, and thereafter on all except those on Main Street until October 20, 1914, and its own interpretation of the franchise for many years, acquiesced in by the public also, is entitled to consideration. Existing conditions and long usage are in harmony with the language of the portion of the franchise in question. Appellant's argument seems to proceed on the assumption that the ordinance prescribed that each particular car shall be operated "in each and every direction." Such is not the language or purport of the ordinance. For all that appears therein, a car may be run over every line in the city before returning, and then return to the starting point over a line other than that on which it started. The rules laid down are for the operation of cars, not any particular car, "upon and along the tracks of said company"—not one or two tracks, but all the tracks. This is exacted in conformity with the following rules: cars to start on said tracks (1) from proper starting points, (2) as early as 6 o'clock A. M., and (3) run continuously (4) as late as 11 o'clock, and shall

run (5) "in each and every direction," (6) "at intervals of not more than 20 minutes up to 10 o'clock P. M.," and (7) between then and 12 o'clock P. M., at least every 30 minutes.

No fair interpretation of this language can be made from it other than that cars are to be operated each way on the track at the intervals stated. The manifest object was to prescribe the minimum of service to be exacted in any schedule to be adopted by the company for the operation of the cars "upon and along the tracks" of the company. Possibly the words "each way" or "in each direction," if inserted in the ordinance, would have been quite as, if not more, definite. But parties are not bound to make use of the most exact language. It is enough if that from which the meaning or intention of the parties can be ascertained is made use of. If the words convey a definite meaning, which involves no absurdity, nor any contradiction in other parts of the instrument, then that meaning apparent on the face of the instrument should be accepted. If expressed in plain and unambiguous terms, whether general or limited, the parties are to be held to mean what they have plainly expressed, and not what the courts, in view of the evidence adduced, believe they should have agreed upon. Just how the cars of the company might be run "in each and every direction" on its tracks—and by this is meant all its lines or tracks—without operating its cars in both directions, we are at a loss to understand. Possibly, in view of the topography of the city and the sparsity of settlement in some localities, it might have been preferable to allow cars to run out a part or all of the way on one track or line and return on another, without going both ways. If this shall prove true, appropriate changes may be effected in renewing the franchise at its termination. Ordinarily, a street car line extends in several directions, and those in Ottumwa furnish no exception. Indeed, in the original plat of what is now a part of Ottumwa, the streets are laid out parallel with the general direction of the Des Moines River and at right angles therewith, and subsequently, streets in

addition were laid out with the points of the compass. Main and Second Streets extend in a northwesterly and southeasterly direction; Church Street, in a southwesterly direction over the Market Street bridge into the portion of Ottumwa south of the river. And from this line, the Ward Street and Sheridan Avenue lines extend due south. Court Street cars run northeast on Market Street, northwest on Fourth Street, northeast on Court Street three blocks, and then due north on the same street, then northeast to North Court Street, and, after some distance, on to the northwest. These conditions may have influenced those preparing the ordinance in inserting "and every," in the portion regulating the operation of cars, and by being over particular, they may thereby have raised the doubt occasioning this litigation. In any event, the language employed is fairly susceptible to the construction that cars are required to move each way on the several lines of defendant's street railway system, at intervals not longer than stated; and franchises are to be strictly construed, where ambiguous, against the grantee and in favor of the public. We have no hesitancy in approving the ruling of the trial court so interpreting the ordinance. *State v. Des Moines City R. Co.,* 159 Iowa 259, 274; *Miners' Bank v. United States,* 1 G. Greene 553, 562; *Blair v. City of Chicago,* 201 U. S. 400 (50 L. Ed. 801, 831); 19 Cyc. 1459; 36 Cyc. 1363.

· II.   Counsel for appellant contend that the omission to operate its cars both ways on Main and Second Streets was not so detrimental to the public interest and did not involve such inconvenience to its patrons as that the court, in the exercise of sound discretion, should have interfered. That the issuance of a writ of mandamus is not a matter of right, but rests in the discretion of the court, was recognized in *Vincent v. Ellis,* 116 Iowa 609. See also *State v. Napier, County Judge,* 7 Iowa 425; *Chance v. Temple,* 1 Iowa 179. As said in *People v. Board of Assessors,* 137 N. Y. 201 (33 N. E. 145):

2. MANDAMUS:
jurisdiction:
granting of
writ: discretion.

"The writ of mandamus is not always demandable as an absolute right, and whether it shall be granted or not frequently rests in the discretion of the court."

See *People v. Olsen*, 215 Ill. 620 (74 N. E. 785), where it was said that:

"When a writ of mandamus is asked, the court may inquire whether it will operate impartially, create confusion and disorder, and whether it will or will not promote substantial justice. Courts, in the exercise of the discretion with which they are vested, may, in view of the *consequences attendant on the issuing of a writ of mandamus, refuse the writ, though the petitioner has a clear legal right for which mandamus is a proper remedy. People v. Board of Supervisors*, 185 Ill. 288 (56 N. E. 1044). The court may act on existing facts, and view the case with reference to the *consequences* of its action."

As seen, the defendant was under legal obligation to operate the cars both ways on Second and Main Streets because of having undertaken so to do, and we have to ascertain whether the trial court, in ordering that it do as it had agreed, abused its discretion. Necessarily, it was difficult to ascertain to what extent the public was inconvenienced by operating the cars one way only on these streets. No count having been made of how many walked each day from Main Street to Second Street to take a car moving west, or from Second Street to Main Street to take cars going east, the safe inference from the facts proven is that the number must have been large. During the year previous to October 1, 1914, 1,409,-069 fares were received on the lines on which the five cars are operated, or an average of 3,860 per day. How many of these were compelled to travel a block to get a car is mere matter of inference, but the loop was near the business center of the city, and business houses are located on each street west of Market Street. According to the evidence, Main Street is the principal business street. Several wholesale houses are located on Commercial Street, south of Main

Street.    The depot of the Chicago, Burlington & Quincy
Railway Company and of the Chicago, Rock Island & Pacific
Railway Company is located two blocks west of Market Street
and about 200 feet south of Main Street, and the depot of
the Chicago, Milwaukee and St. Paul Railway Company and
the Wabash Railway Company is about 700 feet farther on.
Many factories are located along the western portion of Main
Street.    Second Street is thickly settled for 4 or 5 blocks
east of the Chicago, Milwaukee & St. Paul Railway Com-
pany's right of way, as are also several intersecting streets.
To the east, on or near Second Street, are located the public
buildings, such as the post office and courthouse.    Indeed,
these lines are more traveled than others of the city, save
Ward Street, and are so situated that people from all parts of
the city are likely to frequent them in visiting the public build-
ings, stores, factories, and in going to and from the railway
depots.    We entertain no doubt as to the great inconvenience
occasioned the public because of defendant's failure to oper-
ate its cars in both directions on these lines.    Its efforts
to economize are to be commended, in so far as these do not
interfere with the proper compliance with its obligations
under the franchise.    The purpose of the franchise was not
to enable the defendant to earn as much money as possible,
but to furnish the people with adequate means of transporta-
tion.    The proposed economy might have been effected with-
out impairing the efficiency of the system, at a relatively
small expense.    Taking off the loop or shuttle car effected
a saving of $6,500 per annum.    As appears from the evi-
dence, the cars operated between Forest Avenue and Vernon
Street could have alternated in going each way on Main and
Second Streets, thereby giving service in each direction.    To
have made this possible, one turnout must have been changed
and three put in, at an estimated cost of $7,775.    Such ex-
pense would have been met by the saving in little more than a
year, and would have been amply justified in view of the
saving effected.    This mode of operating the cars might occa-

sionally have caused congestion at Market Street, but not of such character as to prevent the safe operation of the cars as suggested. The company, with cars used, was able to give a 10-minute service one way during half the day, and if so, would have experienced little difficulty in furnishing a 20-minute service, at least, both ways, without increase of cars. Of course the manner of operating the cars is within the defendant's control, so long as the service stipulated is furnished, and this much is said to indicate that there exists no reasonable excuse for not giving service such as promised by the acceptance of the franchise. Nor is there any pretense that its earnings are not ample for this purpose.

Enough has been said to indicate that there was no abuse of discretion by the trial court. That a railway company may be compelled by a writ of mandamus to perform

3. MANDAMUS: subject and purposes of relief: compelling compliance with franchise.

its obligation under a franchise is well settled. *City of Potwin Place v. Topeka R. Co.*, 51 Kans. 609 (37 Am. St. 312); *State v. Bridgeton & M. Traction Co.*, 62 N. J. 592 (45 L. R. A. 837); *State v. Hartford & N. H. R. Co.*, 29 Conn. 538; *People v. New York Cent. & H. R. R. Co.*, 28 Hun (N. Y.) 543; *State v. Spokane St. R. Co.*, 19 Wash. 518 (67 Am. St. 739, 41 L. R. A. 515).

The rule to be deduced from the cases relied on by appellant is that a company acquiring two lines of railway between the same termini, operation of one of which will substantially accommodate the public, even though at slight inconvenience to some, will not be compelled to operate both lines; and the same doctrine applies to the maintenance of depots in close proximity. See *Crane v. Chicago & N. W. R. Co.*, 74 Iowa 330; *People v. Rome, W. & O. R. Co.*, 103 N. Y. 95 (8 N. E. 369); *Territory v. Eastern Railway*, 15 N. M. 599 (110 Pac. 852); *Day v. Tacoma R. & Power Co.*, 80 Wash. 161 (141 Pac. 347).

That question is not involved in this case save in principle; for the defendant has abandoned neither line, but

merely failed to operate its cars thereon as required by the franchise. It may readily be conceded that, if adequate service were furnished, with slight inconvenience to a few only, the court would, in the exercise of its discretion, refuse to enforce compliance with the ordinance by the company at considerable sacrifice. But the operation of cars in both directions on each street does not impose an unwarrantable burden on the company. Nor is its failure to do so a mere matter of inconvenience to a few. These are, as the evidence tends to show, the principal business streets of the city. Nearly a million and a half of people travel over them and extensions thereof annually, and it is idle to say that of these only a few are inconvenienced by the cars moving but one way on each street. The entire situation refutes any such conclusion, and leaves no doubt that a very large number of people from all parts of the city are daily inconvenienced by being compelled to run back and forth between streets in order to obtain transportation over defendant's lines.

We are not inclined to interfere with the issuance of the writ of mandamus, as prayed, by the trial court.— *Affirmed.*

EVANS, C. J., GAYNOR and SALINGER, JJ., concur.